**KENDALL–JACKSON WINERY, LIMITED, Plaintiff–Appellant,**

v.

**E. & J. GALLO WINERY, a California corporation, dba Turning Leaf Vineyards, Defendant–Appellee.**

No. 97–16185.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 12, 1998.

Decided July 8, 1998.

---

Frederick P. Furth (argument) and Bruce J. Wecker (brief), Furth, Fahrner & Mason, San Francisco, California, for the plaintiff-appellant.

G. Kip Edwards, Palo Alto, California, for the defendant-appellee.

Before: CHOY, PREGERSON, and BOOCHEVER, Circuit Judges.

PREGERSON, Circuit Judge:

Kendall–Jackson Winery sued E. & J. Gallo Winery for featuring on its wine labels a multicolored grape leaf design that allegedly resembles a similarly colored leaf design that Kendall–Jackson uses on its wine labels (the trademark claim)[1] and for using wine bottles that mimic the overall appearance of Kendall–Jackson's wine bottles (the trade dress claim).[2] Kendall–Jackson claimed that

---

1. A trademark is "any word, name, symbol, or device or any combination thereof" used by a person "to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.

2. A product's "trade dress" is its total image and overall appearance; it includes "features such as size, shape, color, color combinations, texture, or graphics." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir.1989) (internal quotation and citation omitted).

Gallo's conduct violated the Lanham Trademark Act of 1946, 15 U.S.C. §§ 1051 et seq., as well as California's unfair competition laws, Cal. Bus. & Prof.Code §§ 17200 et seq.; id. §§ 17500 et seq. Kendall–Jackson lost the trademark claim on summary adjudication and the trade dress claim after a jury trial. Bound by the jury's factual findings, the district court entered judgment for Gallo on the state unfair-competition claims. Kendall–Jackson now appeals. We affirm.

## FACTS AND PRIOR PROCEEDINGS

Kendall–Jackson is a California winery that has a reputation for producing high quality, mid-priced varietal wines.[3] Since its inception in 1983, Kendall–Jackson has sold over ten million cases of its Vintner's Reserve line of premium wines. By 1994, Kendall–Jackson was selling over $100 million worth of Vintner's Reserve wine a year, and its chardonnay was the number one selling chardonnay in the United States.

During this time, Kendall–Jackson featured on its Vintner's Reserve wine labels a downward-pointing, stylized grape leaf design using various shades of green, yellow, orange, red, and brown. The leaf design was always coupled with a banner that intersected the leaf and that read "KENDALL–JACKSON." See photographs laid out in Appendix I. In addition to using the leaf design, Kendall–Jackson tried to distinguish its Vintner's Reserve wine by packaging the wine in recognizable bottles. The Vintner's Reserve bottles, which came in one of two shapes ("burgundy-style" or "bordeaux-style"),[4] had a rounded flange,[5] a visible cork with printed leaves on it, a brown or burgundy neck label with gold lines on the top and bottom that form an oval in the back, and an off-white label featuring the multicolored leaf design.

Gallo is also a successful California winery. In fact, Gallo is the largest wine-producer in the world. But unlike Kendall–Jackson, Gallo has a reputation for producing lower-priced, non-premium wines. During the time that Kendall–Jackson was establishing itself as a leader in the premium wine market, the market for non-premium wine was rapidly declining.

In 1992, Gallo considered entering the premium wine market. For three years, Gallo conducted extensive market research to determine how best to enter the market. Much of this research was directed at the success of the market leader—Kendall–Jackson Vintner's Reserve. Through its market research, Gallo determined that consumers associate the name "Gallo" with "jug wine" rather than premium wine and that a colorful grape-leaf design attracts consumers.

In accordance with these results, Gallo introduced in the fall of 1995 a line of premium wine that did not use the Gallo name and that featured the consumer-preferred leaf motif. See photograph laid out in Appendix II. Gallo called this wine "Turning Leaf." Like Kendall–Jackson's Vintner's Reserve wines, Gallo's Turning Leaf wines came in either a burgundy-style bottle or a bordeaux-style bottle and featured a rounded flange, a visible cork with printed leaves on it, a brown or burgundy neck label with gold lines on the top and bottom that form an oval in the back, and an off-white label with a prominent, downward-pointing, stylized grape leaf design in various shades of green, yellow, orange, red, and brown.

Six months after Gallo introduced its Turning Leaf line, Kendall–Jackson sued Gallo in the United States District Court for the Northern District of California. Kendall–Jackson asserted claims under the Lanham Act, 15 U.S.C. §§ 1501 et seq., for trademark infringement, trade dress infringement, trademark dilution, and trade dress dilution. Kendall–Jackson also invoked the California and common-law counterparts to the Lanham Act and asserted various unfair competition claims: trademark and trade dress dilution, Cal. Bus. & Prof.Code § 14330; false advertising, Cal. Bus. & Prof.Code § 17500; unfair

---

**3.** A varietal wine is a wine that is made from at least 75% of one variety of grape.

**4.** The "burgundy-style bottle" has a gradual, tapered neck, and the "bordeaux-style bottle" has a

shorter, three-inch bottle neck sitting on rounded shoulders of the bottle.

**5.** A flange surrounds the lip at the top of the bottle neck.

competition, Cal. Bus. & Prof.Code § 7200; common law trademark infringement; common law trade dress infringement; and palming off.

Gallo moved for summary adjudication of Kendall–Jackson's claims of trademark and trade dress infringement. The district court granted Gallo's motion on the trademark claim but denied the motion on the trade dress claim. The trade dress claim went to a jury, and the jury decided that Gallo's trade dress did not infringe Kendall–Jackson's trade dress. Bound by the factual findings of the jury, the district court resolved the remaining claims in favor of Gallo. Accordingly, the district court entered judgment for Gallo on all claims. Kendall–Jackson appeals that judgment.

## DISCUSSION

Kendall–Jackson argues that the district court improperly handled both the trademark claim and the trade dress claim. With respect to the trademark claim, Kendall–Jackson argues that the district court should have denied Gallo's motion for summary adjudication. With respect to the trade dress claim, Kendall–Jackson argues that the district court should have granted Kendall–Jackson's motion for judgment as a matter of law on the first two elements of the claim, given the jury more instructions on the third element, and refused to instruct the jury on any of Gallo's affirmative defenses. As explained below, we find each of Kendall–Jackson's arguments unavailing.

### I. Standards of Review

■ We review de novo grants of summary adjudication motions, *Amdahl Corp. v. Profit Freight Systems, Inc.*, 65 F.3d 144, 145 (9th Cir.1995), and denials of motions for

judgment as a matter of law after trial, *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1268 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997). We review for abuse of discretion a district court's formulation of jury instructions. *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 354 (9th Cir.1996).

### II. General Principles

Section 43(a) of the Lanham Act makes actionable the deceptive and misleading use in commerce of "any word, term, name, symbol, or device" on any goods or in connection with any goods. § 43(a) (codified as amended at 15 U.S.C. § 1125(a)).[6] For a number of years after this section was enacted, courts construed it narrowly to include only two kinds of wrongs: false advertising and the common-law tort of "passing off" one's goods as those of another. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 778, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (Stevens, J., concurring).

■ But over time, § 43(a) has been expanded " 'to create, in essence, a federal law of unfair competition.' " *Id.* at 780, 112 S.Ct. 2753 (Stevens, J., concurring) (quoting the United States Trademark Association Trademark Review Commission Report and Recommendations to USTA President and Board of Directors, 77 Trademark Rep. 375, 426 (1987)). Section 43(a) now protects both trademarks and trade dress from infringement. *See id.* at 773, 112 S.Ct. 2753 (stating that "the protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition" and that "[t]here is no persuasive reason to apply different analysis to the two"). To state an infringement claim under § 43(a)—whether it be a trademark

---

**6.** Specifically, § 1125(a)(1) provides as follows:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with

another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

claim or a trade dress claim—a plaintiff must meet three basic elements: (1) distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion.

■ The distinctiveness element comes from § 2 of the Lanham Act, which sets forth the requirements for registering a trademark. § 2 (codified as amended at 15 U.S.C. § 1052).[7] To be protected under § 2, a mark must be capable of distinguishing the applicant's goods from the goods of others. *Id.* In other words, the mark must be distinctive.

■ Marks are often classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.[8] "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive." *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753. These three categories of marks therefore meet the distinctiveness element automatically. At the other end of the spectrum are generic marks, which can never meet the distinctiveness element.[9]

■ Marks that are descriptive fall in the middle of these two extremes. Descriptive marks are not inherently distinctive and hence do not initially satisfy the distinctiveness element. But descriptive marks can acquire distinctiveness if the public comes to associate the mark with a specific source. Such acquired distinctiveness, which is referred to as "secondary meaning," allows § 43 to protect descriptive marks that otherwise could not qualify for protection as trademarks. *Id.* at 769, 112 S.Ct. 2753.

Thus, "[a]n identifying mark is distinctive and is capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Id.*

But distinctiveness is only the first of three elements for liability under § 43(a). A plaintiff trying to establish liability under § 43(a)

7. Registration is not a prerequisite for protection under § 43(a), *see Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753 (noting that " § 43(a) protects qualifying unregistered trademarks"), but courts look to the general principles qualifying a mark for registration under § 2 when determining whether an unregistered mark is protectable under § 43(a), *id.* at 768, 112 S.Ct. 2753 ("It is common ground that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).").

8. *Generic marks* give the general name of the product; they embrace an entire class of products. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("A generic term is one that refers to the genus of which the particular product is a species."). For instance, "Liquid controls" is a generic term for equipment for dispensing and mixing liquids, *Liquid Controls Corp. v. Liquid Control Corp.,* 228 U.S.P.Q. 382 (N.D.Ill.1985), and "Wickerware" is a generic term for wicker furniture and accessories, *In re Wickerware, Inc.,* 227 U.S.P.Q. 970 (TTAB1985), because those terms simply state what the product is.

*Descriptive marks* define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood. Thus, "Honey Baked Ham" is a descriptive term for a ham that has been baked with honey, *Schmidt v. Quigg,* 609 F.Supp. 227,

226 U.S.P.Q. 518 (E.D.Mich.1985), and "Honey Roast" is a descriptive term for nuts that have been roasted with honey, *Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 228 U.S.P.Q. 625 (D.N.J.1985).

If a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, then the mark does not *describe* the product's features, but *suggests* them. Such a mark is therefore classified as "suggestive" rather than "descriptive." Examples of *suggestive marks* include "Air Care" for a service that maintains medical equipment used for administering oxygen, *Airco, Inc. v. Air Prods. & Chemicals, Inc.,* 196 U.S.P.Q. 832 (TTAB1977), and "Anti–Washboard" for a soap that makes scrubbing unnecessary when washing clothes, *O'Rourke v. Central City Soap Co.,* 26 F. 576 (C.C.E.D.Mich.1885).

*Arbitrary marks* have no relevance to any feature or characteristic of a product. *Fanciful marks* are the most distinctive marks of all; they involve a high degree of imagination.

9. Some commentators disagree. They argue that a generic mark can become distinctive through secondary meaning, much the same way that a descriptive mark becomes distinctive. *See* 3 Rudolf Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 18.03, at 12–13 (4th ed.1994); *see also* discussion on secondary meaning *infra.* But the Supreme Court appears to have rejected that view in *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753: "generic marks ... are not registrable as trademarks."

must *also* prove nonfunctionality and likelihood of confusion.

 A product feature is functional and cannot serve as a trademark " 'if [the product feature] is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850, n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). This doctrine "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Id.* at 164, 115 S.Ct. 1300. Under the functionality doctrine, competitors can reasonably replicate important non-reputation-related product features. *Id.* at 169, 115 S.Ct. 1300.

 The last element—likelihood of confusion—is the most important element of all. *See Two Pesos,* 505 U.S. at 780, 112 S.Ct. 2753 (Stevens, J., concurring) (" '[U]nder the Lanham Act [§ 43(a)], the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks ....' ") (quoting *New West Corp. v. N.Y.M. Co. of Cal., Inc.,* 595 F.2d 1194, 1201 (9th Cir.1979)) (alteration in original). Likelihood of confusion exists when "customers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 845 (9th Cir. 1987) (citation omitted). "Evidence of actual confusion is persuasive proof that future confusion is likely." *Id.* (citation omitted). So is evidence that the defendant intentionally copied the plaintiff's mark: "[Such evidence] is ... entitled to great weight because a defendant is presumed able to accomplish this purpose." *Id.* (internal quotation and citation omitted).

 If a plaintiff has used a mark to identify its goods and if the plaintiff satisfies the three elements discussed above, then the plaintiff has stated a prima facie claim for infringement under § 43(a) of the Lanham Act.

Kendall–Jackson believes that it has presented sufficient evidence to meet these elements for both its trademark and trade dress claims. In fact, with respect to its trade dress claim, Kendall–Jackson believes that it has met the distinctiveness and nonfunctionality elements as a matter of law. Kendall–Jackson therefore argues that the district court erred when it summarily adjudicated the trademark claim in favor of Gallo and when it allowed the jury to address all three elements of the trade dress claim. Kendall–Jackson also challenges the instructions that the court gave (or failed to give) to the jury. We address these arguments in turn below.

### III. Summary Adjudication of the Trademark Claim

The district court summarily adjudicated Kendall–Jackson's trademark claim because "no reasonable jury could conclude from the evidence submitted by Kendall–Jackson that consumers view the Colored Leaf Mark as a symbol of Kendall–Jackson apart from its name and crest." Kendall–Jackson disagrees with the district court's ruling. It argues that a reasonable jury *could* have found that consumers associate the colored-grape-leaf design with Kendall–Jackson and that, in any event, Kendall–Jackson did not need to prove secondary meaning—i.e., consumer-association between the leaf design and Kendall–Jackson—because the design is inherently distinctive.

 We need not address these arguments, however, because even if Kendall–Jackson is correct, Gallo is still entitled to judgment as a matter of law. Grape-leaf designs have become generic emblems for wine. Thus, they are not protectable as trademarks. *See Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753 ("[G]eneric marks are not registerable as trademarks.").

The use of a grape leaf as a mark for wine would normally be inherently distinctive because it suggests, rather than describes, the product. One has to go through two or three

steps to associate the leaf with the product—i.e., a grape leaf comes from a grapevine, which has grapes from which wine is produced. Under the standard test, a grape leaf could be suggestive and thus inherently distinctive. *See Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1218 (9th Cir.1987) ("If a consumer must use more than a small amount of imagination to make the association, the mark is suggestive and not descriptive.").

The difference in the present case is that because wine bottlers other than Kendall–Jackson have long used grape leaves to decorate their labels, that emblem has become generic. *See Boston Beer Co. v. Slesar Bros. Brewing Co., Inc.,* 9 F.3d 175, 180 (1st Cir. 1993) ("At one end of the spectrum there are generic terms that have passed into common usage to identify a product, such as aspirin, and can never be protected."). By itself, a grape leaf cannot differentiate one brand from another because precisely the same reasoning links the same emblem to the product in each case: A grape leaf suggests a grapevine, which suggests a grape, which suggests wine. Because the grape leaf is used widely in the industry, it has lost the power to differentiate brands. *See McCarthy on Trademarks,* § 7:36, at 7–62 (4th ed. 1997) ("A pictorial representation on a label may be so commonplace as to be incapable of creating a separate commercial impression in a buyer's mind. For example, a picture of a chef and a salad bowl on a food label....."). Thus, there is nothing inherently distinctive in the use of a grape leaf as a mark for wine. *See id.* at 7–43 ("The blue 'cornflower' design of the Corning Glass Works was found not to be inherently distinctive, in view of the many flower designs used on tableware and cookware.") (citing *Federal Glass Co. v. Corning Glass Works,* 162 U.S.P.Q. 279 (TTAB 1969)).

A producer's *depiction* of a grape leaf, may, however, be so distinctive as to warrant protection from copying. *See id.* at 7–61 ("[A] stylized and fanciful illustration that merely suggests but does not directly describe or illustrate the product can be a valid mark."). If a particular rendering of a grape leaf has the power to distinguish one brand from another, it is the rendering that should be evaluated for its distinctiveness. A photo-realistic rendering would be merely descriptive, whereas a stylized rendering could be inherently distinctive.[10]

There is no jury question on the copying of any of the distinctive characteristics of Kendall–Jackson's leaf. The most distinctive feature of the Kendall–Jackson grape leaf is that it is separated by a space in the middle where the name of the winery is printed. Less distinctive features are the leaf's downward pointing orientation, and the arguably unusual coloration. Gallo did not, however, depict a bifurcated leaf with its brand name printed in a space between the segments. Gallo's leaf is folded and turns at an angle rather than pointing straight down. Also, the intensity of the coloration is markedly different from that of the original Kendall–Jackson leaf. When viewed in its entirety, we do not see how any distinctive feature of the Kendall–Jackson mark has been duplicated so as to present a jury issue of trademark infringement.

## IV. Jury Trial on the Trade Dress Claim

Kendall–Jackson next attacks the judgment on its trade dress claim. Kendall–Jackson has two major criticisms of the way that the district court handled this claim: the district court should have granted Kendall–Jackson's motion for judgment as a matter of law on two elements of the trade dress claim and the district court should have instructed the jury differently. Neither of these criticisms has merit.

### A. Judgment as a Matter of Law on Distinctiveness and Nonfunctionality

Kendall–Jackson argues that the district court erred when it refused to grant Kendall–Jackson judgment as a matter of law on the nonfunctionality and distinctiveness elements of its trade dress claim. Gallo

---

**10.** Presumably, stylized renditions could be classified along the same "inherently distinctive" spectrum. Compare, e.g., Kandinsky's abstract "Ravine" (seemingly arbitrary) with his subtler "Sea Battle" (fanciful) or Salvador Dali's surrealistic "Portrait of Autumn" (suggestive).

counters that Kendall–Jackson should be precluded from making this argument because Kendall–Jackson objected to Gallo's proposed verdict form, which requested that the jury enter a verdict on each element of the trade dress claim.

The district court apparently submitted its own verdict form, which did not ask the jury to indicate how it found on the three elements of the trade dress claim but asked the jury whether it found infringement, to which the jury answered, "No." This resulted in a judgment in favor of Gallo.

Gallo's argument appears to be as follows: Any error in letting the first two elements of the trade dress claim go to the jury is harmless if the jury found that Kendall–Jackson failed to meet the third element of the claim—likelihood of confusion. But because the jury returned a verdict on a form that did not address each element of the trade dress claim, there is no way to know which element the jury thought was dispositive. Thus, Gallo can not prove harmless error. Because Kendall–Jackson is responsible for the general verdict—which did not ask the jury to state how it decided the elements of the claim—Kendall–Jackson is responsible for Gallo's inability to prove harmless error. Gallo argues that Kendall–Jackson should therefore be estopped from arguing that the error is harmful.

The flaw of Gallo's argument is that Kendall–Jackson objected to the contents of Gallo's proposed verdict form, not to the fact that the form addressed each element of the trade dress claim. Indeed, Kendall–Jackson, too, proposed a verdict form that addressed each element of the trade dress claim. Thus, the fact that Kendall–Jackson objected to Gallo's proposed verdict form should not preclude Kendall–Jackson from contesting the district court's refusal to decide the distinctiveness and nonfunctionality elements as a matter of law.

■ Nonetheless, Kendall–Jackson's argument fails. As Kendall–Jackson points out, a new trial should be granted when a district court erroneously submits to a jury an issue that should have been decided as a matter of law and the basis of the jury's general verdict is unknown. *See City of*

*Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 384, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). But here, the district court did not "erroneously submit[ ] to a jury an issue that should have been decided as a matter of law." *Id.* Kendall–Jackson failed to establish that its trade dress, as a matter of law, was nonfunctional and distinctive.

■ Although Kendall–Jackson presented evidence that could support a jury's finding that the trade dress was nonfunctional and distinctive, that evidence did not compel such a conclusion. Gallo presented contrary evidence that a jury could reasonably believe.

Kendall–Jackson disagrees. It argues that Gallo's evidence, at most, showed that a flanged bottle is functional and that some wineries use leaf designs on their bottles. But, Kendall–Jackson argues, Gallo never showed that Kendall–Jackson's trade dress *as a whole* was either functional or nondistinctive.

■ Kendall–Jackson is correct about the law; the proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive. *See International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822–23. But Kendall–Jackson is wrong about Gallo's evidence. Gallo's evidence was not directed solely at the functionality of a flanged bottle or at the pervasive use of leaf designs on wine bottles. Gallo's evidence also showed that the combination of an exposed cork, a rounded flange, and a neck label create the "California look," which consumers come to expect from a California wine.

A reasonable jury could conclude from this evidence that Kendall–Jackson's trade dress *as a whole* is functional and nondistinctive. For instance, a reasonable jury could conclude that these features—an exposed cork, a rounded flange, and a neck label—constitute a significant part of Kendall–Jackson's trade dress and that granting Kendall–Jackson exclusive use of this combination of features would put competitors at a significant non-reputation-related disadvantage. Such con-

clusions would support a finding that the trade dress as a whole is functional. *See Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (noting that a product feature is functional "if exclusive use of a feature would put competitors at a significant non-reputation-related disadvantage").

Likewise, a jury could conclude from this evidence that the "California-look" tells consumers what the product is or at least describes a characteristic of the product, namely that it is wine from California. This conclusion would support a finding that the trade dress was generic or descriptive and therefore nondistinctive. The fact that Kendall-Jackson's grape-leaf design is distinctive does not necessarily mean that the entire trade dress is distinctive because, as Kendall-Jackson itself emphasizes, trade dress must be analyzed as a whole.

Thus, there were genuine issues of fact about whether Kendall-Jackson's trade dress was distinctive and nonfunctional. The district court therefore properly let the jury decide these issues.

### B. Jury Instructions

Kendall-Jackson faults the district court for instructing the jury on Gallo's affirmative defenses and for failing to instruct the jury on every aspect of likelihood of confusion. Neither of these decisions mandates reversal.

### 1. Affirmative Defenses

■ Kendall-Jackson argues that the district court should not have instructed the jury on Gallo's affirmative defenses because Gallo did not present any evidence to support those defenses. Gallo argues that Kendall-Jackson waived its right to make this argument because it failed to move for a directed verdict on the affirmative defenses. Alternatively, Gallo argues that it did present evidence to support its affirmative defenses and that, in any event, any error in the instructions is harmless because the jury found no infringement and thus did not reach the affirmative defenses.

Because Gallo's harmless-error argument has merit, we need not address the waiver or sufficiency-of-the-evidence arguments. Gallo argues that the jury never got to the affirmative defenses because it found that Gallo did not infringe Kendall-Jackson's trade dress. Therefore, Gallo argues, any error in the affirmative-defenses instructions was harmless. Gallo is correct in its assessment. An error, if any, in the affirmative-defenses instructions was harmless.

### 2. Likelihood of Confusion

Kendall-Jackson's final complaint is that the district court mishandled the jury instructions on likelihood of confusion. The district court gave the jury lengthy instructions on likelihood of confusion. In fact, the instructions are too lengthy to quote here. The instructions explained what likelihood of confusion is, what factors the jury should consider when assessing likelihood of confusion, and the definitions of "actual confusion" and "knowing adoption."

Yet Kendall-Jackson wanted more; it wanted the district court to tell the jury that proof of a defendant's intent to exploit the goodwill in a plaintiff's mark or trade dress creates a rebuttable presumption of confusion, that a second-comer has a duty to name and dress his product so as to avoid all likelihood of consumers confusing it with the product of the first-comer, and that similarities in trade dress weigh more heavily than differences. Kendall-Jackson also argues that the district court's instructions on actual confusion were wrong.

' ■ As to Kendall-Jackson's first argument—that the district court should have given more voluminous instructions—the law is clear: A district court has substantial latitude in tailoring jury instructions, and as long as the district court's instructions "fairly and adequately covered the issues presented, correctly stated the law, and were not misleading," the instructions will be upheld. *Thorsted v. Kelly,* 858 F.2d 571, 573 (9th Cir.1988). Because the district court's instructions more than adequately covered the relevant issues, correctly stated the law, and were not misleading, the district court did

**1052**

not abuse its discretion by refusing to adopt Kendall–Jackson's jury instructions.[11]

 The district court told the jury that the amount of actual confusion may be "discounted" if it is not "substantial."[12] Because one definition of "discount" is "to leave out of account; disregard," *The Random House Dictionary of the English Language,* 410 (1973), the jury may have interpreted this instruction as requiring them to disregard any evidence of actual but insubstantial confusion. This is unlikely, however, because it is apparent that the object to be "discounted" is the term "amount," or more fully, "amount of actual confusion," when read in context:

· If by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion, the amount of actual confusion is not substantial and may be discounted.

Where the term "discount" is applied to a quantity or an "amount," most of the definitions applicable to "discount" denote reducing, rather than eliminating, the original quantity or amount. In the context used by the district court, "discount" means "to make a deduction in evaluating the significance or worth of," to "view as unimportant," "minimize," "depreciate," "underrate," "disparage," "diminish," "lessen," and so forth. *Webster's Third New International Dictionary of the English Language Unabridged,* 646 (1976). Although there was some risk of ambiguity in the phrasing, considered in con-

text, we do not believe that the jury could have been misled. The jury was properly instructed on the factors for determining likelihood of confusion (only one of which is actual confusion), and Gallo presented compelling evidence on these factors.[13] For instance, Gallo introduced a survey that showed that although some people might be confused by Gallo's Turning Leaf trade dress, a significant portion of the general public is not likely to be confused.

Thus, even if the jury had treated Kendall–Jackson's actual confusion evidence as "strong evidence," the jury would probably have thought that, overall, Gallo's likelihood-of-confusion evidence was stronger than Kendall–Jackson's opposing evidence.

In sum, the district court properly denied Kendall–Jackson's motion for judgment as a matter of law on the first two elements of its trade dress claim and fairly and adequately instructed the jury on likelihood of confusion. Because the jury's verdict of no infringement was not based on Gallo's affirmative defenses, any error in the affirmative-defenses instructions is harmless. Finally, the district court's jury instructions on actual confusion were not erroneous.

## V. Bench Trial on the State Law Claims

The district court relied on the jury's factual findings when it decided that Kendall–Jackson lost its state law unfair competition claims. But the district court gave an alter-

11. Besides, some of Kendall–Jackson's proposed instructions may conflict with applicable law. For example, Kendall–Jackson wanted the district court to instruct the jury that a defendant's intent to exploit the goodwill in a plaintiff's mark or trade dress creates a rebuttable presumption of confusion. But in *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 844–45 (9th Cir.1987), this court stated that proof of intent to cause confusion is entitled to *great weight,* not that it creates a presumption of confusion that shifts the burden of proof to the other party.

12. The instruction was as follows:

If Gallo's use of the Turning Leaf Trade Dress has resulted in substantial actual confusion, this suggests that there is a likelihood of confusion. In considering whether there has been substantial actual confusion you should weigh the instances of actual confusion against the opportunities for such confusion. If the instances of

actual confusion have been relatively frequent, you may find that there has been substantial actual confusion. If, by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion, the amount of actual confusion is not substantial and may be discounted.

13. The court instructed the jury on "some of the factors" that it should consider, including the strength or weakness of Kendall–Jackson's mark, Gallo's use of the trade dress, the similarity of the trade dresses, actual confusion, knowing adoption of Kendall–Jackson's trade dress, distribution channels, market factors, and likelihood of expansion of product lines. The district court explained each of these factors and informed the jury that "[t]he presence or absence of any particular factor that I suggest should not necessarily resolve whether there is a likelihood of confusion, because you must consider all relevant evidence in determining this issue."

nate reason for ruling in favor of Gallo: Kendall–Jackson's inequitable conduct precluded it from receiving the equitable relief that it sought. The district court found that "[j]ust before this action commenced, in May 1996, Kendall–Jackson altered the label on it Vintner's Reserve trade dress to resemble more closely the label used on Turning Leaf." Because there is sufficient evidence to support this finding, the district court's finding is not clearly erroneous. Therefore, we affirm the district court's judgment with respect to the state law claims.

## CONCLUSION

Because Kendall–Jackson's grape-leaf design is generic, Gallo was entitled to judgment as a matter of law on the trademark claims. Accordingly, the summary adjudication of the trademark claim is affirmed.

The judgment on the trade dress claim is also affirmed because the district court properly denied Kendall–Jackson's motion for judgment as a matter of law on the distinctiveness and nonfunctionality elements, because the district court properly instructed the jury on likelihood of confusion, and because any error in the affirmative-defenses instructions is harmless.

Finally, the judgment on the state law claims is affirmed because Kendall–Jackson's inequitable conduct precludes it from receiving equitable relief.

Accordingly, the judgment in favor of Gallo is AFFIRMED.

APPENDIX I

APPENDIX II

TURNING LEAF

CALIFORNIA

Chardonnay

1994

ALC. 12.5 % BY VOL

304300F