ELECTROPIX, d/b/a Live Wire, Plaintiff,

v.

LIBERTY LIVEWIRE CORPORATION; Liberty Media Corporation; and Does 1–9, inclusive, Defendants.

No. CV 01–4651 FMC (MCX).

United States District Court, C.D. California.

Aug. 20, 2001.

Daniel M. Cislo, Robert J. Lauson, Cislo & Thomas, Santa Monica, CA, for Plaintiff.

Rod S. Berman, Jeffrey K. Riffer, Alan Leggett, Jeffer Mangels Butler & Marmaro, Los Angeles, CA, for Defendants.

## ORDER RE: PRELIMINARY INJUNCTION

COOPER, District Judge.

### I. Background

Plaintiff Electropix, Inc. is a California corporation doing business as Live Wire Productions or Live Wire ("Plaintiff"), with offices in Rancho Palos Verdes, County of Los Angeles, California. Plaintiff is in the business of feature film and television production, including digital, sound and design effects, animation, commercials, location-based attractions, simulations, and interactive media. (Comp., ¶ 4) After over ten (10) years of existence, Plaintiff remains a small company, with four (4) employees and up to sixteen (16) additional contract workers. (Kristen Dec., ¶ 5)

Defendant Liberty Livewire Corporation ("Liberty Livewire") is a Delaware corporation with offices in Santa Monica, County of Los Angeles, California. Liberty Livewire, including a company formerly known as Todd–AO Corporation and numerous other companies located in Los Angeles, is also in the business of feature film and television production, including post production services, digital effects, sound design, and animation. (*Id.* at ¶ 5)

Defendant Liberty Media Corporation ("Liberty Media") is a Delaware Corporation with offices in Englewood, Colorado. (*Id.* at ¶ 6) Liberty Livewire is a majority owned subsidiary of Liberty Media, which holds interests in a broad range of video programming, communications, technology, and Internet businesses in the United States, Europe, South America and Asia, *See Liberty Livewire Corporation,* at *http://www. libertylivewire.com/news/ 3Q2000 EarningsRelease.htm* (last visited July 30, 2001).

Since August 30, 1990, Plaintiff has been using its trade name and trademark "Live Wire" in connection with its services. (*Id.* at ¶ 8, Ex. A) Recent work by Plaintiff includes commercial spots for the Disney Channel; ABC/Disney; a television pilot; a theme park attraction for Paramount/MGM; as well as many film and

television projects. (*Id.* at ¶ 10) Plaintiff has been recognized for its high quality interactive programs. (Scott Dec., ¶ 3)

On July 6, 1999 Defendants filed an intent-to-use federal trademark application for the mark "Liberty Livewire" for goods and services, including production of television programming. That application is pending. (*Id.* at ¶ 11)

On June 12, 2000 Todd–AO Corporation announced it had changed its name to Liberty Livewire Corporation as part of a transaction with Liberty Media. The name change became effective June 9, 2001. (*Id.* at ¶ 12, Ex. B)

In early August, 2000 Plaintiff learned for the first time of Liberty Livewire's name change and of Liberty Media's trademark application. (*Id.* at ¶ 13)

On September 18, 2000 Plaintiff filed a federal trademark application to register its mark "Live Wire." The application is pending. (*Id.* at ¶ 14, Ex. C) Plaintiff also filed a California trademark application to register its service mark "Live Wire." That application was granted and the mark was registered in California on October 23, 2000. (*Id.* at ¶ 15)

On October 20, 2000 counsel for Plaintiff sent a letter to Defendants, asserting infringement of its mark "Live Wire." (*Id.* at ¶ 16, Ex. D) The parties exchanged correspondence, but no agreement was reached between them. (*Id.* at ¶ 17; Exs. E, F) In February of 2001, counsel for Plaintiff and Defendants exchanged another round of correspondence, but to no avail. (*Id.* at Ex. F; Opp., Schachter Dec., ¶¶ 8–11)

On March 15, 2001 the United States Patent and Trademark Office ("USPTO") issued an "Office Action" in Plaintiff's trademark application, noting that Plaintiff's application may be rejected in view of Defendants' pre-existing trademark application. (*Id.*, Ex. G)

In May, 2001 Plaintiff became aware of Liberty Livewire's use of the mark "Livewire" alone, without "Liberty," in conjunction with its business. (*Id.* at ¶ 19, Ex. H; Kristen Dec., Exs. M, N)

There are currently forty-three (43) individual companies operating under Liberty Livewire Corporation. (*Id.* at Ex. I) Three of those companies, Hollywood Digital, Pop Studios, and Riot, provide visual effects in direct competition with Plaintiff. (*Id.* at ¶ 20)

On May 23, 2001 Plaintiff filed an action for: (1) infringement of an unregistered trademark in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) state trademark infringement, CAL. BUS. & PROF. CODE § 14320; (3) unfair competition, CAL. BUS. & PROF. CODE § 17200; (4) common law trademark infringement; and (5) opposition of trademark application. Plaintiff alleges that actual confusion exists between its mark "Live Wire" and Defendants' mark "Liberty Livewire." Plaintiff contends that said confusion has recently intensified due to Liberty Livewire's acquisition of additional companies and due to its use of "Livewire" alone, without "Liberty," in its advertising. Plaintiff requests the Court to enjoin Defendants from using the term "Live Wire" in connection with the offering of feature film, television and multimedia production services; from using the trade name and trademark "Liberty Livewire" or "Livewire" in connection with the advertising, offering for sale, and sale of feature film and television production services; and from using the mark and trade name "Live Wire" in any way in the conduct of their business, advertising, promotion, and when answering their telephones. (*Id.* at ¶ 1(a)-(b), (e)). The injunction is sought for the County of Los Angeles. (Motion, 20:1–3; 20:28–21:1; Reply, 2:3–4)

After considering the parties' written and oral arguments, the Court issues the following decision:

## II. Preliminary Injunction Standard

The Court will grant a preliminary injunction in a trademark case when the moving party "demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in [the moving party's] favor." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir.2000) (internal quotations omitted). These alternatives "are not separate tests but the outer reaches of a single continuum." *Int'l Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 822 (9th Cir.1993). "Essentially, the trial court must balance the equities in the exercise of its discretion." *Id.*

## III. Trademark Infringement Claim

"The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir.1993) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992)) (quotation marks omitted). At the preliminary injunction stage, Plaintiff must establish that it is "likely to be able to show ... a likelihood of confusion" in Defendants' use of the mark. *See GoTo. com*, 202 F.3d at 1205 (citing *Brookfield Communications, Inc. v. West Coast Entm't*, 174 F.3d 1036, 1053 n. 15 (9th Cir.1999)). The Court's concern for confusion among "consumers" as opposed to the general public is grounded in the very purpose of trademark law.

[T]rademark law, by preventing others from copying a source-identifying mark, "reduce[s] the customer's costs of shopping and making purchasing decisions," for it quickly and easily assures a potential customer that this item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.

*Qualitex Co. v. Jacobson Products Co. Inc.*, 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (citation omitted).

The Court looks to the eight factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979) (setting forth what are often referred to as "the *Sleekcraft* factors") to determine whether a likelihood of confusion exists: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) degree to which the marketing channels converge; (6) types of goods and degree of care consumers are likely to exercise when purchasing; (7) intent of defendants in selecting the infringing mark; and (8) likelihood that the parties will expand their product lines. *Id.* at 348–50; *see also Official Airline Guides*, 6 F.3d at 1391; *Gallo*, 967 F.2d at 1290. This list of factors is neither exhaustive nor exclusive and is intended to guide the Court in assessing the basic question of likelihood of consumer confusion.[1] *See Gallo*, 967 F.2d at 1290. Moreover, the factors are not to be applied in a mechanical manner. *See Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d

---

1. "The Ninth Circuit has emphasized that at the preliminary injunction stage, the trial court is not required to consider all of those factors since the record will not likely be sufficient to permit thorough consideration." *Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F.Supp.2d 976, 984 (N.D.Cal.1999).

1127, 1129 (9th Cir.1998). The eight-factor test is a "pliant" one in which "some factors are much more important than others." *Brookfield,* 174 F.3d at 1054.

### (1) *Strength of the Mark*

A strong mark is inherently distinctive and will be provided broad protection. *See Sleekcraft,* 599 F.2d at 349. "The strength of a mark is determined by its placement on a continuum of increasing distinctiveness: (1) generic[2], (2) descriptive[3], (3) suggestive[4], (4) arbitrary[5], and (5) fanciful."[6] *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *see also Gallo,* 967 F.2d at 1290. The last three categories are deemed inherently distinctive and are entitled to protection. *See Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753. In contrast, descriptive marks require a showing of consumer association of the mark with a particular source, or secondary meaning, before receiving protection. *See Gallo,* 967 F.2d at 1291. Generic marks can never be trademarked. *See Filipino Yellow Pages,* 198 F.3d at 1147.

■ Classifying "Live Wire" as arbitrary, Plaintiff argues its mark is inherently strong. Defendants, on the other hand, contend that "Live Wire" is merely descriptive or suggestive of the "merit, quality, and other attributes of plaintiff's services." (Opp. to Bench Brief, 8:2–3) Defendants cite to two cases to support their contention that Plaintiff's mark is descriptive or, at best, suggestive. First, in *Colgate–Palmolive Co. v. Carter–Wallace, Inc.,* 58 C.C.P.A. 735, 432 F.2d 1400 (1970), the Court found that "Peak" in "Peak Period" is suggestive as applied to personal deodorant because "Peak" is

---

2. A generic mark is the name of a product or the actual service itself. *See Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.,* 198 F.3d 1143, 1147 (9th Cir.1999). Specifically, if the mark of a product answers the question, "what are you?", then it is a generic mark. *See id.*

3. A descriptive mark provides the consumer with information and a description of the product. *See Sleekcraft,* 599 F.2d at 349. These marks "define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." *See Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1047 n. 8 (9th Cir.1998). For example, "Honey Baked Ham" is a descriptive term for a ham that has been baked with honey. *See Kendall–Jackson Winery, Ltd.,* 150 F.3d at 1047 n. 8 (citation omitted).

4. A suggestive mark subtly connotes something about the product. *See Sleekcraft,* 599 F.2d at 349. Specifically, suggestive marks require the consumer to use imagination or some type of "multistage reasoning" to understand the mark's significance. *See Kendall–Jackson Winery, Ltd.,* 150 F.3d at 1047 n. 8. Courts have found the following marks

suggestive: the use of "Air Care" for medical equipment used for administering oxygen and "Anti–Washboard" for soap that makes scrubbing unnecessary when washing clothes. *See Kendall–Jackson Winery, Ltd.,* 150 F.3d at 1047 n. 8 (citation omitted).

5. An arbitrary mark consists of a word or symbol which is in common usage in the language, but which is arbitrarily applied to the goods or services in question in such a way that it is not descriptive or suggestive. *See Schwab,* 665 F.Supp. at 805. For instance, the word "stork" was found to be arbitrary when applied as the name of a nightclub: "it is in no way descriptive of appellant's night club, for in its primary significance it would denote a club for storks." *Stork Rest. v. Sahati,* 166 F.2d 348, 355 (9th Cir.1948).

6. A fanciful mark is the most distinctive mark of all; it involves a high degree of imagination. *See Kendall–Jackson Winery,* 150 F.3d 1042, 1047 n. 8 (9th Cir.1998). A fanciful mark has no intrinsic connection to the product with which the mark is used and consists of a wholly made-up term, such as "Clorox" to describe bleach. *See Brookfield,* 174 F.3d at 1058.

"simply a common noun or adjectival word of everyday usage in the English language." *Id.* at 737, 432 F.2d 1400. Second, the Court in *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722 (7th Cir.1998) found the word "Platinum" in "Platinum Home Mortgage Corp." to be descriptive because it describes the quality of the plaintiff's mortgage services and suggests that it provides a superior service. *Id.* at 728. Defendants conclude that, like "Peak" and "Platinum," the mark "Live Wire" is descriptive or suggestive of the quality and nature of Plaintiff's services.

The Court does not agree. In the cases cited above, the words "Peak" and "Platinum" are used as adjectives to describe the quality of the respective plaintiffs' products. The words, in their common, everyday usage, connote the highest quality of something or reaching the highest level. "Live Wire" has no such adjectival force. "Live Wire" is defined as "an alert, active and aggressive person." [7] There is no association between the mark "Live Wire" and the quality or nature of Plaintiff's service; post production work for film and television. "The distinctiveness of a mark cannot be determined in the abstract, but only by reference to the goods or services upon which the mark is used." 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS, § 11:64 (4th ed.2000). The Court concludes that the mark "Live Wire" as applied to Plaintiff's service is arbitrary.

Furthermore, Plaintiff notes that its mark has been in use for over ten years, and the long and continuous use of a mark in the marketplace enhances its strength. *See Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988) (Marks may be strengthened by length of time in business.). Defendants argue that extensive third-party use of the mark weighs against finding that the mark is strong. Defendants present a trademark search report displaying over 200 companies using "Livewire" and point out that several of those companies are in the same industry as Plaintiff. (Freebairn Dec., ¶¶ 3–8) Defendants, however, paint an exaggerated picture. Many of these registrations have either been cancelled or abandoned. Many of the companies listed do not use the mark "Livewire" in their names. For example, the trademark search report lists companies named "Live Picture," "Live Technologies," "Activewire," and "Live to Play." (*Id.* at Ex. A) Furthermore, Defendants point to only two examples of companies using the mark "Livewire" that are in the same or similar industry as Plaintiff, and both of these companies do business outside the Los Angeles area, where Plaintiff's injunction is sought.[8] "Evidence of other unrelated potential infringers is irrelevant to claims of trademark infringement." *E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F.Supp. 457, 462 (N.D.Cal.1991) (citing *Eclipse Associates Ltd. v. Data General Corp.,* 894 F.2d 1114, 1119 (9th Cir.1990)). This factor weighs in Plaintiff's favor.

### (2) *Proximity of Services*

"Related goods are more likely than non-related goods to confuse the public as

---

7. Plaintiff set forth this definition of "Live Wire" in its motion for preliminary injunction, and Defendants do not take issue with it in their responding papers

8. The two examples Defendants point to are: (1) Live Wire Recording Studios, located in South Field, Michigan, providing sound effects for television commercials and advertisements (Freebairn Dec., Ex. B); and (2) Live Wire Media Productions, located in Erie, Pennsylvania, which is in the business of creating, producing and developing videos and web sites (*Id.* at Ex. D).

to the producers of goods." *Official Airline Guides, Inc.*, 6 F.3d at 1392. "[P]roducts which would be reasonably thought by the buying public to come from the same source if sold under the same mark" are considered related. *Sleekcraft*, 599 F.2d at 348 n. 10. Moreover, when goods are complementary, sold to the same class of purchasers, or similar in use and function, less similarity between the marks is needed when analyzing this factor. *See Sleekcraft*, 599 F.2d at 350.

The focus of this factor, therefore, is whether the buying public is likely to associate Plaintiff's services with Defendants'. *See Dreamwerks*, 142 F.3d at 1131. Plaintiff argues that its services are directly competitive and highly related to Defendants'. Both parties provide post production services, digital effects, sound design, and the like. Defendants admit this factor favors Plaintiff, but "not by much." (Opp., 13:9–10)

(3) *Similarity of the Marks*

█ Similarity of the marks is "a critical question in the likelihood of confusion analysis." *GoTo.com, Inc.*, 202 F.3d at 1205. The greater the similarity between the two marks, the greater the likelihood of confusion. *See id.* at 1206. Similarity is determined by the appearance, sound and meaning of the marks when considered in their entirety and as they appear in the marketplace. *See id; Dreamwerks*, 142 F.3d at 1131; *Sleekcraft*, 599 F.2d at 351. The similarities of the marks are weighed more heavily than the differences. *See GoTo.com*, 202 F.3d at 1206; *Brookfield*, 174 F.3d at 1054.

Plaintiff contends that Plaintiff's and Defendants' marks are essentially the same. The dominant portion of Defendants' mark "Liberty Livewire" or "Livewire" is essentially identical to the dominant portion of Plaintiff's marks "Live Wire Productions" or "Live Wire."

Defendants argue that the marks should be compared in the context of the marketplace in which they are sold. Plaintiff and Defendants sell very specialized, custom-tailored technical and creative services to sophisticated customers. These sophisticated consumers purchase the services over an extended period of time and after significant interaction with the respective sellers. Confusion between Plaintiff's company "Live Wire" and Defendants' company "Liberty Livewire" is therefore unlikely.

The Court agrees with Defendants to the extent that their mark "Liberty Livewire" is not confusingly similar to Plaintiff's "Live Wire." Conflicting marks must be compared in their entireties, and the Court does not see how the term "Livewire" is any more salient than the term "Liberty." *See, e.g., Official Airline Guides*, 6 F.3d at 1392 ("[U]nder the anti-dissection rule, the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace."); *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir.1999) ("The use of identical dominant words does not automatically mean that two marks are similar.... (citation omitted). We must look to the overall impression created by the marks, not merely compare individual features.").

Moreover, "[a] realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine ... what a reasonable purchaser in market conditions would do." *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 504 (8th Cir.1987). Here, potential customers will spend significant sums for Plaintiff's and Defendants' services. As Defendants point out,

both companies sell their services based on the creative talent of their personnel. Defendants maintain that their customers choose them based on the highly advanced quality and specialized nature of their facilities, and the proximity and familiarity of their facilities to various customer bases. It is therefore unlikely that consumer confusion will arise between "Liberty Livewire" and "Live Wire." This factor weighs in favor of Defendants.

■ The Court does, however, believe that confusion is likely if Defendants advertise or otherwise engage in business solely as "Livewire." Plaintiff has presented examples of Defendant Liberty Livewire advertising and answering phones solely as "Livewire." (Kristen Dec., Ex. M; Supp. Dec., ¶ 14, Ex. G). If Defendants continue to advertise and do business as "Livewire," consumer confusion is highly probable, as Plaintiff and Defendants would provide identical services under identical names.

The Court also believes that confusion is likely if Defendants advertise or otherwise engage in business as "Livewire" in combination with other descriptive or generic terms. The record reflects that Defendants also operate under the following names: Livewire Studios, Livewire Media, HyperTV with Livewire, and Livewire Network Services. Here, the common element of Plaintiff's and Defendants' marks is the dominant name, "Livewire", which the Court has already determined is an arbitrary mark and therefore deserving of protection. "When a junior user incorporates the entire arbitrary mark of another, addition of a suggestive or descriptive element is generally not sufficient to avoid confusion." MCCARTHY ON TRADEMARKS, § 23:50. "[T]he general rule is that a subsequent user may not avoid likelihood of confusion by appropriating another's entire mark and adding descriptive or non-

distinctive matter to it." *Id.* This rule is illustrated by the Ninth Circuit's holding in *Golden Door, Inc. v. Odisho*, 646 F.2d 347 (9th Cir.1980). In *Golden Door*, plaintiff, operator of "Golden Door" health and beauty spa, sought injunctive relief against defendant's use of "Golden Door" in his operation of hair salons. Specifically, defendant used the names "Golden Door Coiffeur" and "Golden Door for Hair" in reference to his salons. The Ninth Circuit granted injunctive relief to plaintiff, enjoining defendant's use of "Golden Door Coiffeur" and "Golden Door for Hair" in light of the parties' overlapping services and overlapping markets. *See id.*, at 351. The addition of such descriptive terms as "for hair" and "coiffeur" did not reduce the likelihood of confusion.

In the present case, the addition of such generic or descriptive terms as "Studios," "Media," "HyperTV," and "Network Services" does not reduce the likelihood of confusion between Plaintiff's and Defendants' marks. Plaintiff and Defendants offer identical services and compete in the same geographic market. There is a strong likelihood that consumers doing business with Plaintiff might mistakenly believe they are doing business with Defendants, the primary concern in "reverse confusion" cases such as this one. *See Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir.1998). This factor weighs in favor of Plaintiff.

*(4) Evidence of Actual Confusion*

■ Evidence of actual confusion is "persuasive proof that future confusion is likely." *Kendall–Jackson Winery*, 150 F.3d at 1048 (citation omitted). However, such evidence is rarely available at the Preliminary Injunction stage. *See, e.g., Sony Computer Entm't Am., Inc. v. Gamemasters*, 87 F.Supp.2d 976, 984 (N.D.Cal.) ("[T]he Ninth Circuit has emphasized that

at the preliminary injunction stage, 'the trial court is not required to consider all of [the Sleekcraft factors]' since the record will not likely be sufficient to permit thorough consideration.") (citing *Apple Computer, Inc. v. Formula Intern. Inc.,* 725 F.2d 521, 526 (9th Cir.1984)); *Brookfield,* 174 F.3d at 1060 (finding that evidence of actual confusion was not relevant to Plaintiff's motion for preliminary injunction because Plaintiff had filed suit before Defendant actively began using the mark and therefore never had the opportunity to collect information on actual confusion).

Plaintiff introduces evidence of misdirected phone calls and other inquiries. (Kristen Dec., ¶ 13, Ex. C; Supp. Dec., ¶¶ 3–4) Plaintiff claims that in May, 2001 alone, there have been at least seventeen (17) instances of actual confusion.[9]

Defendants argue that there is no evidence of any mistaken purchasing decision. Defendants point to the deposition testimony of Plaintiff's co-founder and Chief Financial Officer Kristen Simmons, who stated she was not aware of anyone who purchased goods or services from Defendants mistakenly believing they were purchasing goods or services from Plaintiff. (Leggett Dec., Ex. K, Kristen Dep., 112:13–114:9)

Courts have explicitly held, however that the use of another's trademark in a manner calculated "to capture initial consumer attention, *even though no actual sale is finally completed as a result of the confusion,* may be still an infringement." *Dr. Seuss Enterprises, L.P. v. Penguin Books U.S.A., Inc.,* 109 F.3d 1394, 1404 (9th Cir.1997) (citing *Mobil Oil Corp. v.*

*Pegasus Petroleum Corp.,* 818 F.2d 254, 257–258 (2d Cir.1987)) (emphasis added). That is, even if potential customers would eventually learn that the two sources of goods or services are unrelated well before any actual sale was consummated, "[s]uch initial confusion works a sufficient trademark injury." *Mobil Oil,* 818 F.2d at 260; *see also Brookfield,* 174 F.3d at 1063 ("the diversion of consumers' initial interest is a form of confusion against which the Lanham Act protects."). Here, consumers may initially be attracted to Defendants' "Livewire," believing it to be Plaintiff's company. Defendants would improperly benefit from the goodwill that Plaintiff has developed in its mark as a result of over ten years of existence. *See also Interstellar Starship Services, Ltd. v. Epix Inc.,* 184 F.3d 1107, 1111 (9th Cir.1999) (initial interest confusion may be created even if the customer is never confused about defendant's lack of connection to plaintiff's mark). This factor weighs in favor of Plaintiff with respect to Defendants' use solely of the mark "Livewire."

Furthermore, reverse confusion may result if Defendants are allowed to continue using the mark "Livewire" alone in connection with their business. Reverse confusion occurs when consumers do business with the senior user under the mistaken impression it is the junior user. *Dreamwerks,* 142 F.3d at 1129. The Ninth Circuit has recognized claims for reverse confusion to protect the small senior user from losing control over its identity in "the rising tide of publicity associated with the junior mark." *Id.* Plaintiff has been a small company for over ten years. "Liberty Livewire is a leading, multi-national,

---

9. Defendants object to the admissibility of this "evidence." However, "[t]he strict evidentiary rules governing a trial on the merits" do not apply to hearings for preliminary injunctions. *Orantes–Hernandez v. Smith,* 541 F.Supp. 351, 355 n. 4 (C.D.Cal.1982). Courts

"may give even inadmissible evidence some weight when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984).

independent provider of technical and creative services to sophisticated consumers in the entertainment industry." It has multiple facilities in metropolitan Los Angeles, New York and London, as well as operations in Atlanta, Georgia; San Francisco, California; Miami, Florida; Minneapolis, Minnesota; Mexico City, Mexico; and Barcelona, Spain. (Walston Dec., ¶¶ 3,4) There is a danger of reverse confusion if Defendants continue to use the "Livewire" mark standing alone.

### (5) *Marketing Channels*

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. Plaintiff and Defendants sell their services to the same pool of customers, advertising in the same publications. (Kristen Dec., ¶ 14, Exs. O, P) This factor weighs in Plaintiff's favor.

### (6) *Degree of Consumer Care*

"Likelihood of confusion is determined on the basis of a 'reasonably prudent consumer.' ... What is expected of this reasonably prudent consumer depends on the circumstances." *Brookfield*, 174 F.3d at 1060 (citations omitted). Generally, when purchasing expensive items, the buyer is expected to be more discerning and less easily confused. *See id.; see also Gallo*, 967 F.2d at 1293.

The Court finds that a reasonable consumer is likely to exercise a high degree of care in selecting the services at issue here. Plaintiff and Defendants offer very specialized, custom-tailored technical and creative services to sophisticated customers, including senior executives at television and movie studios. The services are offered on a project-by-project basis, with customers spending significant sums. The services are unique, not fungible, and so customers are more discerning, *e.g., M2 Software, Inc. v. Viacom, Inc.*, 119 F.Supp.2d 1061,

1069 (C.D.Cal.2000) (consumers likely to use a high degree of care when selecting a product that cannot be purchased off the shelf); *EA Eng'g, Science, and Tech., Inc. v. Envtl. Audit, Inc.*, 703 F.Supp. 853, 858 (C.D.Cal.1989) (finding a high degree of care where "[b]oth Plaintiff and Defendant engage in highly specialized services that entail a sophisticated clientele, a negotiated contract generally involving many thousands of dollars, and close working relationships with the client."). This factor weighs in Defendants' favor with respect to the mark "Liberty Livewire."

However, virtually no amount of consumer care can prevent confusion where two entities have the same name. It is irrational to expect that even the most sophisticated consumer will exercise the kind of scrupulous examination that would enable him or her to discern the difference between "Livewire" and "Live Wire." This factor weighs in favor of Plaintiff with respect to "Livewire."

### (7) *Intent in Adopting Mark*

"When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *See Official Airline Guides*, 6 F.3d at 1394; *see also Sleekcraft*, 599 F.2d at 354. Although intent to confuse consumers can constitute strong evidence of confusion, "[t]he converse...is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source." *Brookfield*, 174 F.3d at 1059 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 287 (6th Cir. 1997)). Plaintiff has presented no evidence, however, to support a finding of bad faith on the part of Defendants. The Court finds that this factor is irrelevant.

### (8) *Likelihood of Expansion*

"[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (internal citations omitted). This factor is also irrelevant since the parties already sell directly competitive and highly related services.

### (9) *Balancing*

 On balance, the Court finds Plaintiff has demonstrated a likelihood of probable success on the merits with respect to Defendants' use of the mark "Livewire" standing alone or in combination with other generic or descriptive terms. In a trademark infringement case, irreparable injury is presumed based on such a finding. *See Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, 89 F.Supp.2d 1154, 1164 (C.D.Cal.2000); *Vision Sports Inc. v. Melville Corp.*, 888 F.2d 609, 612, n. 3 (9th Cir.1989). The Court does not find, however, that a likelihood of confusion exists between Plaintiff's "Live Wire" mark and Defendants' mark "Liberty Livewire."

### IV. Bond

Fed.R.Civ.P. 65(c) provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

### V. Conclusion

Plaintiff's Motion for Preliminary Injunction is granted with respect to Defendants' use of the mark "Livewire" standing alone or in combination with generic or descriptive terms, including but not limited to "Studios," "Media," "Hyper TV," "Network Service," "Corporation," "Post–Production," "Effects," and "Interactive Media," in any way in the conduct of their business, including advertising, promotions, and answering telephones.

Plaintiff's request to enjoin Defendants' use of the mark "Liberty Livewire" in connection with their business is denied. The injunction will take effect solely in the County of Los Angeles and will be effective on the posting of a bond by Plaintiff in the sum of $25,000.

IT IS SO ORDERED.