**IMAGE ONLINE DESIGN, INC., Plaintiff,**

v.

**CORE ASSOCIATION and Ken Stubbs, Defendants.**

**No. CV 99–11347 RJK.**

United States District Court, C.D. California.

June 22, 2000.

Edward R. Schwartz, Christie Parker & Hale, Pasadena, CA, for plaintiff.

Donald A. Daucher, Michael K. Lindsey, Paul Hastings Janofsky & Walker, Los Angeles, CA, for defendants.

## MEMORANDUM OF DECISION AND ORDER GRANTING DEFENDANTS CORE ASSOCIATION AND KEN STUBBS'S MOTION FOR SUMMARY JUDGMENT

KELLEHER, District Judge.

Pursuant to Federal Rule of Civil Procedure 56, Defendant CORE Association ("CORE") filed a motion summary judgment as to all claims. The Court has considered the moving and responding papers as well as the colloquy at oral argument, and for the reasons set forth below the Court *grants* Defendants' motion.

### I.  Introduction

On October 29, 1999, Plaintiff Image Online Design, Inc. ("Image Online") filed an action against CORE and Ken Stubbs ("Stubbs"), CORE's president. Image Online seeks injunctive and monetary relief under two theories:

1) False designation of origin;  and

2) Unfair competition.[1]

Subject matter jurisdiction is purportedly based on diversity jurisdiction pursuant to 28 U.S.C. §§ 1338(a) and (b).

---

1.  As part of its relief, Image Online had initially sought cancellation of CORE's trademark application.  However, CORE's application for federal trademark was rejected by the examining attorney at the United States Patent and Trademark Office ("PTO") in the course of this litigation.  Because the time to appeal the examining attorney's decision passed as of May 5, 2000, both parties agree that Plaintiff's claim for cancellation of a trademark application is moot.

Plaintiff claims that it has common law trademark rights in the service mark ".web" which are being infringed by Defendants. In particular, it claims that Defendants have attempted to misappropriate Plaintiff's mark by providing computer network addresses and domain name registry services using the .web mark. Among other requests, Plaintiff desires that Defendant and its agents be enjoined from using the mark .web as a trademark, service mark, or trade name, or in any advertising.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant CORE moves for summary judgment. The parties have stipulated to a bifurcation of the issues in this case. At this point, Defendant only requests the Court to determine whether Plaintiff has enforceable service mark rights in the term .web.

## II. Statement of Facts

The following recital of facts is a synthesis of the papers submitted, articles read by the Court as background for this Order, and the discussion that occurred at the hearing. The relevant facts at issue for this motion are further identified in the analysis section of this Order.

## A. The Evolution of the Domain Name System

When a person or entity seeks to maintain an Internet web site, that party must reserve a location, called an Internet Protocol ("IP") Address. Because a random numeric address is difficult to remember, alphanumeric domain names are used. In order for a user to access the web site, the user enters the alphanumeric domain name[2] combination that corresponds to the assigned IP Address and is routed to the host computer. Up until very recently, an independent organization called Network Solutions, Inc. ("NSI") had the exclusive responsibility to perform the "translation" function of converting the user's alphanumeric domain name into the appropriate IP Address.

In 1993, the National Science Foundation awarded a five-year cooperative agreement to NSI,[3] under which NSI was to serve as the exclusive provider of domain name registration services for those using the nonmilitary Top Level Domain ("TLD") names—.com, .net, .org, .edu and .gov.[4]

The International Ad Hoc Committee ("IAHC") was formed in 1996 and was charged with the task of developing administrative and management enhancements for the domain name system. In its Final Report, the IAHC called for the creation of seven new generic TLDs ("gTLDs") —.firm, .store,[5] .web, .arts, .rec, .info, and .nom.[6] The

---

2. An alphanumeric domain name usually consists of two levels: a Second Level Domain and a Top Level Domain. For example, in the United States Courts' website, "http://www.uscourts.gov," the Second Level Domain is "uscourts" and the generic Top Level Domain is ".gov." The "http://" refers to the protocol used to transfer information, and the "www" simply refers to the World Wide Web.

3. Cooperative Agreement No. NCR–9218742, Network Information Services Manager(s) for NSFNET and the NREN: INTERNIC Registration Services.

4. There are actually two types of TLDs: generic and country code. All country code TLDs are two letters, e.g. .ca for Canada and .tm for Turkmenistan. The seven generic TLDs currently used are .com, .org, .net, .gov, .edu, .mil and .int. In this Order, the terms "TLD" and "gTLD" (generic Top Level Domain) will be used interchangeably.

5. This recommendation was later changed to .shop.

6. Although the IAHC has been disbanded, its Final Report may still be found at http://www.iahc.org/ draft–iahc–recommend–00.-html. The recommended gTLDs would be used for the following types of entities:

.firm    for businesses, or firms
.store   for businesses offering goods to purchase
.web     for entities emphasizing activities related to the World Wide Web

Final Report also recommended that second level domain names within the new gTLDs be distributed and administered by different, competing, registrars dispersed throughout the world, rather than just by NSI.

In response to the IAHC's Final Report, the United States Department of Commerce ("DOC") issued its own recommendations.[7] The White Paper set forth the DOC's recommendations as to how technical management of Internet domain names should develop once NSI's contract expired. The DOC sought to remedy the "widespread dissatisfaction" with the manner in which the domain name system had been run. It based this asserted dissatisfaction on (i) increased trademark disputes; (ii) growing commercial interest in the Internet and the attendant calls for a stronger management structure; (iii) international concerns that the United States government retained too much control over the domain name registration; and (iv) the absence of competition in the field of domain name registrars.

Because the United States government had been involved in the early development of the Internet, many parts of the domain name system were either performed outright by U.S. government agencies, or pursuant to contracts with such agencies, including NSI's registrar activities. The DOC White Paper encouraged the ending of U .S. government involvement, but was concerned with how the removal would be implemented. The DOC

White Paper made numerous suggestions as to how the U.S. government removal would be implemented, as well as recommendations for how increased Internet activity could be encouraged while ensuring that trademark rights were protected.

One such recommendation was the formation of a private corporation with oversight capabilities. In 1998, the Internet Corporation for Assigned Names and Numbers ("ICANN") was formed. ICANN is a non-profit, private California corporation created expressly to assume responsibility for the IP address space allocation, protocol parameter assignment, domain name system management, and root server system management functions previously performed under U.S. Government contracts.[8]

In November 1998, the DOC entered into a Memorandum of Understanding with ICANN to develop a plan for the management of the domain name system (the "ICANN MoU").[9] Under the ICANN MoU, ICANN and the DOC attempt to jointly design, develop and test the procedures used to carry out domain name system management functions without interrupting the functional operation of the Internet. Of specific relevance for this case, ICAAN and DOC agreed to oversee the development of a policy for determining the circumstances under which new gTLDs would be added to the root system and to collaborate in the development of a plan for the introduction of

.arts   for entities emphasizing cultural and entertainment activities

.rec   for entities emphasizing recreation/entertainment activities

.info   for entities providing information services

.nom   for those wishing individual or personal nomenclature

7. *See* "Management of Internet Names and Addresses" (the "DOC White Paper"). The DOC White Paper is a statement of policy from the United States Department of Commerce regarding the domain name system, and is available at http:// www.ntia .doc.gov/ ntiahome/domainname/6_5_98dns.htm.

The DOC White Paper was the successor to an earlier document entitled "A Proposal To Improve Technical Management of Internet Names and Addresses" (the "DOC Green Paper"), which is still available at http://www.ntia. doc.gov /ntiahome/domainname/dnsdrft.htm.

8. Information about ICANN can be found at http:// www.icann.org/general/ abouticann.htm.

9. The ICANN MoU can be found at http://www.icann.org/ general/ icann–mou–25nov98.htm.

competition in domain name registration services, including the development of accreditation procedures for new domain name registrars and the selection of third parties to participate in a test of the competitive domain name registration system.

In November 1999, ICANN and DOC arrived at an agreement regarding accreditation guidelines for the appointment of the companies that would participate in the testing of the new competitive domain name registration system. These new companies share registration functions for the popular .com, .net, and .org gTLDs. One of these agreements, which was arrived at through a consensus-based process, is a registry agreement under which NSI will operate the registry for the .com, .net, and .org gTLDs.[10] All ICANN-accredited registrars are to have equal access to this registry operated by NSI. The terms of the registrars' access to the registry, including how the registrars are to place and renew registrations, are governed by the revised NSI–Registrar License and Agreement.[11] As of the date this Order, there are currently forty-two companies listed on ICANN's web site as "accredited, and currently operational" registrars.

### B. Image Online and CORE

Plaintiff Image Online provides "telecommunication services, namely, computer network addressing and domain name registry services using .web." In a declaration by Plaintiff's president, Plaintiff further explains the services it offers in connection with the gTLD .web:

(a) commercial information and directory services for locating the computer network address and demographic information of entities;

(b) providing services enabling entities to access, add, modify, or delete infor-

mation relating to their computer network addresses;

(c) providing domain name registration and administrative services for others on a global computer information network;

(d) providing search engines for obtaining dates on a global computer network;

(e) registering, servicing, reserving, and trading addresses on global computer networks;

(f) providing a directory of organizations, including addresses, and resources accessible through the use of a global computer network; and

(g) electronic mail and electronic storage and forward messaging.

It should be noted that all domain name registration activities involving the gTLD .web are on a preregistration basis only. Because .web is not an approved gTLD at this time, no domain names can be assigned with this gTLD. Plaintiff alleges that it has performed at least some of the above services in connection with .web since the fall of 1996.

Defendant CORE is one of ICAAN's accredited registrars who has access to NSI's registry for domain names using the .com, .net, and .org gTLDs. Defendant CORE is an association based in Geneva, Switzerland of member registrars who have access to NSI's registry. CORE provides a directory of member entities that a prospective registrant may use to register its domain name, and has over 85 registrar members worldwide.

### III. Legal Standard

### A. Standard Governing the Motion for Summary Judgment

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

**10.** The Registry Agreement can be found at http://www.icann.org/nsi/nsi –registry–agreement–04nov99.htm.

**11.** NSI–Registrar License and Agreement can be found at http://www .icann.org/nsi/nsi–rla–04nov99.htm.

there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(e). Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the facts and draw inferences in the manner most favorable to the nonmoving party. *See Chaffin v. United States*, 176 F.3d 1208, 1213 (9th Cir.1999).

In a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "[A] mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City of San Francisco*, 125 F.3d 1328, 1331 (9th Cir.1997) (quoting *Anderson*, 477 U.S. at 249, 252, 106 S.Ct. 2505).

In judging evidence at the summary judgment stage, courts must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, if no factual showing is made in opposition to a motion for summary judgment, the district court is not required to search the record sua sponte for some

genuine issue of material fact. It may rely entirely on the evidence designated by the moving party showing no such triable issue. *See Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 403 (6th Cir.1992). "When the nonmoving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." · *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

**B.  Standard Governing Trademark Infringement**

■ In order to prevail on its trademark infringement claim, Image Online must prove (1) that it has a valid protectable trademark and (2) that Defendant's use of the same or a similar mark causes a likelihood of confusion in the minds of the relevant consuming public. *See* 15 U.S.C. § 1114(1)(a); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir.1987). As explained earlier, the parties stipulated to having the Court determine only whether Plaintiff has a protectable trademark at this stage of the litigation.

### IV.  ANALYSIS

**A.  .Web is Not a Valid Trademark Because It Does Not Function as Such**

#### 1.  A gTLD Does Not Point to Source.

■ The purpose of trademark is to aid in the "[i]dentification of the manufacturer or sponsor of a good or the provider of a service." *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 305 (9th Cir.1992). Trademarks represent a "limited property right in a particular word, phrase, or symbol." *Id.* at 306. The Supreme Court has described "the basic objectives of trademark law" as follows:

> trademark law, by preventing others from copying a source-identifying mark, 'reduce[s] the customer's costs of shopping and making purchasing decisions,'

for it quickly and easily assures a potential customer that this item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At 'the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.

*Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (internal citations omitted).

■ Plaintiff contends that its use of .web has been such that it has developed trademark rights in the service mark as to all of its alleged services.[12] Defendants contend that Plaintiff has no such rights. Specifically Defendants assert that the mark .web as used by Plaintiff is generic or, at most, descriptive.

### a. .Web Does Not Indicate Source to a Potential Registrant.

In order for .web to be a service mark, it must indicate to the consumer who is the provider of the services. In theory, there are two potential consumers which the Court must consider. The first potential consumer is the registrant of the domain name that wishes to use the .web as the gTLD in its domain name. The second potential consumer is the website visitor that is trying to gain access to a website that ends in .web.

The relevant question as to the first customer is "Does .web point to Image Online, or any anonymous source, for the potential registrant?" Under the system as presently used, the answer must be "No, no registrant would believe that .web indicated a certain registrar." Under the current registration system, a registrant may obtain a domain name with .com, .net and .org gTLDs from numerous different registrars. Because all the registrars can register domain names using any of the three gTLDs, a gTLD is useless for the purpose of indicating source of registry. Consequently, there is no reason why a registrant would believe that .web provided any information indicating the source of registry, and Plaintiff has not attempted to provide any evidence that potential registrants do believe that Image Online (or even an anonymous single source) is the exclusive registrar.

The Court recognizes that Image Online places a "TM" after ".web" on its website and asserts that "all rights [are] reserved ." However, Plaintiff cannot unilaterally confer upon itself valid trademark rights simply by asserting them. Presently .web is not a gTLD that can be used in commerce. No default server will recognize a website ending in .web. Plaintiff makes this fact very clear in its website. It states:

Please be aware that the process for addition to the root servers has been the subject of debate since 1995, and while the Internet Corporation for Assigned Names and Numbers (ICANN) has indicated that new top-level domains will be created, there is no guarantee as to the timetable and procedures for these additions.... [T]here is no way to anticipate how long ICANN will take to complete the process, what conditions will be imposed for entry into the root servers, and what procedure will be enacted for such entry. Any concern or doubt on

12. Although Plaintiff provides a lengthy listing of these services, a close reading of the alleged services reveals that they all relate to the services generally provided by a domain name registrar. In fact, Plaintiff even states that it "provides essentially the full range of services for its .web registrants that NSI has performed for .com registrants." Plaintiff may not create a triable issue out of its own self-serving declarations. *See Hansen,* 7 F.3d at 138. In the same way, Plaintiff may not create a triable issue by parsing a general service position into its attendant job description. Plaintiff is acting as a registrar. Its self-serving affidavit does nothing more than further explain what a registrar's job entails. Accordingly, the Court will analyze the alleged infringement of the mark .web as it relates to Image Online's services as a registrar.

your part as to this process should be taken into account before registering your domains in this registry ...; your registration shows your support for both our claim, and the addition of new top-level domains.

*The .Web Internet Domain RegistryInformation* (visited May 30, 2000) <http://www.webtld.com/Information/>.

In essence, Plaintiff explains to its potential registrants that .web *may* be an upcoming gTLD and Image Online *may* be a registrar. Taken as a whole, the website does not indicate to a potential registrant that Image Online has exclusive registry rights of the .web TLD. It is unlikely that a potential registrant would see a domain name ending with .web in the near future, since no such domain name is recognized at this time. However, even if they were able to view other domain names that end in .web, given the website registration as it now stands, there is no reason that a potential registrant would think that all of those domain names were registered by a single source.

### b. .Web Does Not Indicate Source to a Potential Web Site Visitor

In the same way, a domain name ending in .web does not indicate source to a web site customer. A consumer understands source as it relates to web sites through the second-level domain name. Only second level domains indicate source. In *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, the Ninth Circuit explained that "[t]he domain name is more than a mere address: like trademarks, *second-level domain names* communicate information as to source." 174 F.3d 1036, 1055 (9th Cir.1999) (emphasis added). The court could have simply said that "domain names communicate information...." Such a statement would have been accurate and still allowed for the possibility that top-level domain names indicate source, also. However, it did not. Instead, the Ninth Circuit explicitly isolated "second-level domain names" as the

part of the domain name that communicates information as to source. By implication, therefore, the rest of the domain name only signifies the IP address. It is clear by this statement, and under the domain name system as it is presently used, that the TLD does not communicate information as to the source of the domain name's registrar.

In order for Plaintiff to show a trademark right in .web for its registry services, it would have had to provide evidence that consumers interpret a domain name as pointing to two sources, one for the second level domain name and the second for the TLD. It has not, and such an idea defies common understanding of the Internet.

■ Survey data would have been the most helpful to show whether consumers interpret a TLD as pointing to source. However, neither party provided such evidence. Nevertheless, "[e]vidence of the public's understanding of a term may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers and other publications." *In re Merrill Lynch*, 828 F.2d 1567, 1570 (Fed. Cir.1987) (citations omitted). One of the foremost trademark authorities takes the position that "the '.com' or other top level domain name adds nothing to the distinctiveness of the designation." 1 J. Thomas McCarthy, Trademarks and Unfair Competition, § 7:17.1 at 7–27 (4th ed.1996 & Supp.2000).

### 2. Existing Authority Indicates that Only the Second Level Domain Points to Source.

### a. Courts Ignore the gTLD When Analyzing Potential Infringement by a Domain Name.

The lack of trademark significance in a TLD is implicit in current trademark jurisprudence relating to the Internet. When analyzing potential trademark infringement, the Ninth Circuit and other courts have repeatedly found that trademark rights exist in the *second level domain*

name in a website address. *See e.g., Brookfield,* 174 F.3d at 1055 (approving of the district court's comparison between a domain-name combination, moviebuff.com and a trademark, MovieBuff); *Interstellar Starship Serv. Ltd. v. Epix, Inc.,* 184 F.3d 1107, 1110 (9th Cir.1999) ("epix.com" is, "for all intents and purposes, identical in terms of sight, sound, and meaning" to "EPIX."); *Public Serv. Co. v. Nexus Energy Software, Inc.,* 36 F.Supp.2d 436 (D.Mass.1999) (finding "energyplace.com" and "Energy Place" to be virtually identical); *Minnesota Mining & Mfg. Co. v. Taylor,* 21 F.Supp.2d 1003, 1005 (D.Minn. 1998) (deciding that "post-it.com" and "Post–It" were the same); *Planned Parenthood Federation of America, Inc. v. Bucci,* No. 97–0629, 1997 WL 133313, at *8 (S.D.N.Y.Mar.24, 1997) (concluding that "plannedparenthood.com" and "Planned Parenthood" were essentially identical).

Not once has any court imputed trademark rights to a gTLD. In fact, rather than look *at* a gTLD to determine trademark rights, the Ninth Circuit and others ignore the TLD as though it were invisible next to the second level domain name in an infringement action. The Ninth Circuit and other courts' analyses of trademark infringement in the context of domain names further reinforce this Court's finding that a TLD is not subject to trademark protection.

### b. The Patent and Trademark Office Specifically Disallows Registration of Trademark of a gTLD.

Similarly, although it is not evidence, the Court is mindful that the United States Patent and Trademark Office ("PTO") declines to interpret a TLD as indicating source. In its Examination Guide No. 2–99, the PTO specifically states that

> When a trademark [or] service mark . . . is composed, in whole or in part, of a domain name, neither the beginning of the URL (http://www.) nor the TLD have any source indicating significance. Instead, those designations are merely devices that every Internet site provider must use as part of its address. Today, advertisements for all types of products and services routinely include a URL for the web site of the advertiser. Just as the average person with no special knowledge recognizes "800" or "1–800" followed by seven digits or letters as one of the prefixes used for every toll-free phone number, the average person familiar with the Internet recognizes the format for a domain name and understands that "http," "www," and a TLD are a part of every URL.

United States Department of Commerce, Patent and Trademark Office, Examination Guide No. 2–99, *Marks Composed, in Whole or in Part, of Domain Names* (Sept 29, 1999).[13]

Taken as a whole, the Court agrees with the PTO in its conclusion that a TLD and other non-distinctive modifiers of a URL like "http://www" have no trademark significance. As it is used in this case, .web does not point to any source, including Image Online.[14]

### 3. .Web Indicates *Type* of Website

A gTLD does not indicate *source* of anything. Rather, it indicates *type* of web-

---

13. Examination Guide No. 2–99 may be found at <http://www.uspto.gov/web/offices/tac/notices/guide299.htm>.

14. The Court is mindful that the mark .web could be used as a service mark in certain contexts. For example, if Image Online had tried to use .Web as the name of its database charting the habits of common arachnids, such a use would reasonably point to Plaintiff as the source of the database. The Court is certain that there are a number of services to which trademark rights in .web might attach. However, services associated with a domain name registrar are not those such services. As stated before, the Court rejects Plaintiffs attempt to create a triable issue of fact as to this issue. Plaintiff cannot create a triable issue of fact simply by describing the services of a registrar in a self-serving declaration. *See generally Hansen,* 7 F.3d at 138. When Defendants raised the issue of whether the domain name registry services could be a use to which a service mark right in .web would attach, Plaintiff had an obligation to provide *admissible* evidence of other services performed by Plaintiff in conjunction with .web

site. In *Brookfield*, the Ninth Circuit analyzed a domain name as it infringed upon a federal trademark. It found that the ".com" in one party's complete domain name was "inconsequential in light of the fact that ... the ".com" top-level domain signifies the site's commercial nature." *See Brookfield*, 174 F.3d at 1055. The Ninth Circuit's reasoning clearly indicates to what a TLD points. Rather than pointing to the source of the registry, a TLD points to the content of the site. The gTLD ".com" indicates that the site is commercial. The gTLD ".org" is supposed to indicate that the site is associated with a non-profit organization. All the gTLDs presently used and potentially upcoming indicate a particular *type* of website.

**B. .Web Would Not be Protectable Under Traditional Trademark Analysis.**

■ It appears to the Court that Plaintiff's primary use of .web as a gTLD removes it from the ambit of a trademark completely. There is no trademark protection available for a mark that does not clearly point to the source of a service that may or may not be actually operational. Such a lack of certainty defies categorization. Nevertheless, even if the Court had to categorize .web as it relates to the services of a registrar, it is generic.

■ Trademarks are classified in five categories of "increasing distinctiveness": (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A mark that is suggestive, arbitrary or fanciful is inherently distinctive

and is afforded automatic trademark protection.[15] *Id.* Descriptive marks, while not inherently distinctive, are entitled to protection if they acquire distinctiveness or "secondary meaning," i.e. if consumers come to associate them with a specific producer rather than a general class of goods. *See Kendall–Jackson Winery v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir.1998). Generic marks can never attain distinctiveness are therefore not protectable. *Id.*

Generic marks refer to the "genus of which the particular product or service is a species." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). A generic term is "the name of the product or service itself—what [the product] is, and as such ... the very antithesis of a mark." 2 McCarthy, *supra*, § 12:1[1]. In determining whether a term is generic, courts have often relied upon the "who-are-you/what-are-you" test: "A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the [generic] name of the product answers the question 'What are you?'" *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir.1999) (citations omitted).

The .web mark has to be framed appropriately in order to determine the proper determination in the "who vouches for you?/what are you?" dichotomy. To be able to place the .web mark in the context of registry services, yet in isolation as a mark, a proper term to analyze would be "XYZ.web" or "anydomainname.web." In this context, Defendants have a strong argument that the mark .web is generic. A reading of the IAHC's Final Report, *su-*

---

to which protectable trademark rights could attach.

**15.** Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood.... If a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, then the mark does not describe the

product's features, but suggests them. Such a mark is therefore classified as 'suggestive' rather than 'descriptive.' ... Arbitrary marks have no relevance to any feature or characteristic of a product. Fanciful marks are the most distinctive marks of all; they involve a high degree of imagination.

*Kendall–Jackson Winery v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir.1998).

pra, shows that the purpose of having the .web gTLD was to indicate that the website is related to the World Wide Web. Accordingly, if the question "what are you?" is posed to XYZ.web, the answer is "a website related to the World Wide Web." In contrast, the answer to "who vouches for you?" would be either "IAHC" or a shrug. In other words, .web seems to represent a genus of a type of website.

Dictionary definitions also often assist in determining whether a mark is generic because "generic usage implies use consistent with [a term's] common understanding." *Mil–Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1158 (7th Cir.1996). The Internet Dictionary (1995) defines "web" as "the most commonly used name for the World Wide Web." Placing a period in front of the word "web" would commonly be understood to indicate a website. Accordingly, the mark ".web" would commonly be understood as a website related to the World Wide Web. Under both analyses, it is clear that the mark ".web" is generic.

In sum, Plaintiff's use of the mark .web in connection with domain name preregistration services does not confer trademark protection. As a gTLD, .web does not indicate the *source* of the services; instead, it indicates the *type* of services. The Court finds that .web, as used here, falls out of the ambit of trademark categorization. Further, even if it could be categorized, .web is simply a generic term for websites related to the World Wide Web. Accordingly, the mark is not protectable.

## IV. Disposition

For the reasons set forth above, Defendants' motion for summary judgment is **granted.** Because Plaintiff may not prevail in an action in which it has no trademark rights, the case is dismissed.

IT IS SO ORDERED.