**NISSAN MOTOR CO., LTD.; Nissan North America, Inc., Plaintiffs,**

v.

**NISSAN COMPUTER CORPORATION, Defendant.**

No. CV99–12980 DDP (MCX).

United States District Court, C.D. California.

Dec. 5, 2001.

Mark A. Flagel, Daniel Scott Schecter, Michael Jon Lawrence, David J. Schindler, Latham & Watkins, Los Angeles, CA, for plaintiffs.

Mark B. Fredkin, Morgan Ruby Schofield, Franich & Fredkin, San Jose, CA, Neil D. Greenstein, Robert M. Vantress, Techmark, San Jose, CA, David H. Martin, Christensen

Miller Fink Jacobs Glaser Weil & Shapiro, Los Angeles, CA, for defendants.

## ORDER DENYING DEFENDANT'S MOTION FOR LEAVE TO INCLUDE SIX STATE–LAW COUNTERCLAIMS IN ITS SECOND AMENDED ANSWER

PREGERSON, District Judge.

This motion comes before the Court on the defendant's motion to file a second amended answer and counterclaims. After reviewing and considering the materials submitted by the parties and hearing oral argument on July 23, 2001, the Court adopts the following order.

## I. BACKGROUND

### A. FACTUAL BACKGROUND

Plaintiff Nissan Motor Co., Ltd., is a large Japanese automaker. Its subsidiary, plaintiff Nissan North America, Inc., markets and distributes Nissan vehicles in the United States. Nissan Motor Co. owns, and Nissan North America is the exclusive licensee of, various registered trademarks using the word "Nissan" in connection with automobiles and other vehicles. The first such trademark was registered in 1959. Nissan North America also operates an Internet website at "www.nissan-usa.com."

The defendant, Nissan Computer Corporation, is a North Carolina company in the business of computer sales and services. The company was incorporated in 1991 by Uzi Nissan, its current president. Mr. Nissan has used his surname in connection with various businesses since 1980. Nissan is also a term in the Hebrew and Arabic languages. In 1995, the defendant registered a trademark for its Nissan Computer logo with the State of North Carolina.

The defendant registered the Internet domain names "www.nissan.com" and "www.nissan.net" in May 1994 and March 1996, respectively. For the next several years, the defendant operated websites at these addresses providing computer-related information and services. In July 1995, the plaintiffs sent the defendant a letter expressing "great concern" about use of the word Nissan in the defendant's domain name.

In August 1999, the defendant altered the content of its "www.nissan.com" website. The website was captioned "www.nissan.com," and displayed a "Nissan Computer" logo that is allegedly confusingly similar to the plaintiffs' "Nissan" logo. In addition, the website displayed banner advertisements and web links to various Internet search engines and merchandising companies. These advertisements included links to automobile merchandisers, such as "www.cartrackers.com" and "www.1StopAuto.com;" links to auto-related portions of search engines; and links to topics such as "Car Quotes," "Auto Racing," and "Off Road."

In October 1999, the parties met to discuss the possible transfer of the www.nissan.com domain name. Negotiations were unsuccessful.

### B. PROCEDURAL BACKGROUND

On December 10, 1999, the plaintiffs filed a complaint in this Court alleging: (1) trademark dilution in violation of federal and state law; (2) trademark infringement; (3) domain name piracy; (4) false designation of origin; and (5) state law unfair competition. Also on December 10, the Court denied the plaintiffs' request for a temporary restraining order, scheduled the matter for a preliminary injunction hearing, and approved limited expedited reciprocal discovery.

On February 4, 2000, the defendant filed a motion to dismiss for lack of personal jurisdiction, or, in the alternative, for improper venue. The plaintiffs' preliminary injunction hearing came before the Court for oral argument on February 7, 2000. The Court deferred ruling on the preliminary injunction pending briefing on the defendant's motion to dismiss.[1]

On March 23, 2000, the Court issued an order granting the plaintiffs' motion for a

---

1. In the interim, on March 8, 2000, the defendant filed a declaratory relief action in the Eastern District of North Carolina, which, following transfer, on July 25, 2001 this Court dismissed for the purpose of consolidating the two cases.

preliminary injunction and denying the defendant's motion to dismiss. *Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, 89 F.Supp.2d 1154, 1162–64 (C.D.Cal.2000).[2] The Court found that the plaintiffs had demonstrated a valid, protectable trademark interest in the "Nissan" mark and a likelihood of confusion. Accordingly, the Court held that the plaintiffs had shown a likelihood of success on the merits of their trademark infringement claim. The Court ordered the defendant to post prominent, identifying captions and disclaimers on its "www.nissan.com" and "www.nissan.net" websites, and to cease displaying automobile-related content on these websites.

On May 10, 2000, the defendant filed counterclaims against the plaintiffs alleging (1) "reverse domain name hijacking;" (2) interference with prospective economic advantage; (3) unfair competition/unfair trade practices; (4) unjust enrichment/constructive trust; (5) accounting; (6) "trademark misuse/cancellation of registrations;" and (7) "fraud on the U.S. Patent and Trademark Office."

On July 31, 2000, the Court dismissed with prejudice: the defendant's first and sixth counterclaims because they had no basis in law; and the defendant's second through fifth counterclaims, inasmuch as they were brought based on the plaintiffs' commencement of litigation, because they were barred by the *Noerr–Pennington* doctrine and California's litigation privilege. The Court did not dismiss the defendant's second through fifth counterclaims, inasmuch as they were brought based on the plaintiffs' nonlitigation conduct.

On May 29, 2001, the defendant filed the instant motion for leave to file a second amended answer and counterclaims ("SAA"). The proposed SAA reasserted the defendant's second through fifth and seventh original counterclaims and asserted new counterclaims for (1) "cancellation of trademark registrations and abandonment of pending trademark applications;" (2) "fraud in the United States Patent and Trademark Office;" (3) "violation of right to publicity in name;" and (4) false advertising. The plaintiffs opposed the defendant's motion, claiming that the defendant's amendments should be rejected for futility. On July 23, 2001, the Court heard oral argument on the motion.

On August 1, 2001, the Court issued an order granting the defendant leave to file three of the nine total counterclaims, for (1) "cancellation of trademark registrations and abandonment of pending trademark applications;" (2) "fraud in the United States Patent and Trademark Office;" and (3) "fraud on the United States Patent and Trademark Office."[3] The Court deferred ruling on the defendant's six proposed state-law counterclaims—for (1) interference with prospective economic advantage; (2) unfair competition/unfair trade practices; (3) unjust enrichment/constructive trust; (4) accounting; (5) "violation of the right to publicity in name; and (6) false advertising—pending further briefing on two threshold issues."[4]

---

**2.** The Court's March 23, 2000 order was affirmed by the Ninth Circuit on December 26, 2000. *Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, 246 F.3d 675 (Table), 2000 WL 1875821 (9th Cir.).

**3.** In its reply in support of the instant motion, the defendant pointed out that its second proposed cause of action, for "fraud in the United States Patent and Trademark Office," and its seventh proposed cause of action, for "fraud on the U.S. Patent and Trademark Office," differ. (Reply in Support of Mot. to File SAA at 2 n. 2.) According to the defendant,

The Seventh cause of action arises out of Nissan Motor's willful misrepresentation, in registering the "Nissan" mark for software, that no other person had the right to use the mark (¶ 173). The fraud stated in the Second cause

of action . . . arises out of Nissan Motor's willful misrepresentation that it was the sole owner of the "Nissan" mark when it was, at best, a joint owner with other Japanese companies (¶ 149).

(*Id.*)

**4.** On August 1, 2001, the Court ordered the parties to file two sets of cross-briefs. One set addressing (1) what property rights, if any, the defendant's ownership of the Internet domain names "nissan.com" and "nissan.net" gives the defendant in the Internet search terms "nissan" and "nissan.com", and (2) if the Court were to find that the defendant has no proprietary interest in the Internet search terms, whether such a finding would prevent the defendant from stating a claim under the proposed state-law counterclaims. The other set addressing (1) whether

Having received and considered the parties' initial and supplemental briefing, the Court, for the following reasons, denies the defendant's motion for leave to file its six proposed state-law counterclaims.

## II. DISCUSSION

### A. LEGAL STANDARD FOR LEAVE TO AMEND

█ Federal Rule of Civil Procedure 15(a), which governs requests for leave to amend, provides that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The Ninth Circuit has held that amendments should be granted with "extreme liberality" in order to "facilitate decision on the merits, rather than on the pleadings or technicalities." *United States v. Webb,* 655 F.2d 977, 979 (9th Cir.1981). Accordingly, the burden of persuading the court that leave should not be granted rests with the nonmoving party. *See DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir.1987).

█ Granting leave to amend, however, should not constitute "an exercise in futility." *Id.* A proposed amendment is futile "if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v.*

*Rykoff–Sexton, Inc.,* 845 F.2d 209, 214 (9th Cir.1988).[5] Leave to amend should not be granted where "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *New v. Armour Pharm. Co.,* 67 F.3d 716, 722 (9th Cir.1995). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon,* 59 F.3d 815, 845 (9th Cir.1995), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996).

### B. APPLICATION

All of the defendant's six proposed state-law counterclaims are grounded on a common set of allegations that the plaintiffs "intentionally, willfully, maliciously, and unlawfully" purchased various Internet search terms, such as "nissan" and "nissan.com", from various Internet search engine operators, which, when typed into the search engines, result in the searcher being directed to a website of the plaintiffs' choosing, rather than the defendant's website. (Proposed SAA ¶¶ 135–38.) According to the proposed SAA,

> [a]s a result of the purchase of these search terms ... customers, potential customers, and others using a search engine, or a recent browser, looking for Nissan Computer will be wrongfully re-directed to

California or North Carolina law should apply to each of the six proposed state-law counterclaims, and (2) if North Carolina law applies to any of the six claims, whether the defendant has stated claims under North Carolina law.

5. The proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Federal Rule of Civil Procedure 12(b)(6). *See Rose v. Hartford Underwriters Ins. Co.,* 203 F.3d 417, 420 (6th Cir.2000) ("A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss."). Rule 12(b)(6) provides for dismissal when a complaint fails to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). A complaint fails to state a claim if it does not allege facts necessary to support a cognizable legal claim. *See Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir.1984).

In applying Rule 12(b)(6), the court must presume the truth of the factual allegations in the

complaint and draw all reasonable inferences in favor of the nonmoving party. *See Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995); *see also Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Dismissal under 12(b)(6) is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (dismissal appropriate only where "plaintiff can prove no set of facts in support of his claim which would entitle him to relief" (footnote omitted))); *see also Ascon Props., Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152 (9th Cir.1989). Under Rule 12(b)(6), "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754–55 (9th Cir.1994). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the plaintiff's claim. *See Usher,* 828 F.2d at 561.

Nissan Motor, ... will not find Nissan Computer ..., will believe that Nissan Computer is no longer in business and, as a result, Nissan Computer will lose customers and suffer irreparable damage to its goodwill.

(Proposed SAA ¶¶ 136–37.) In other words, "Nissan Motor has, *with knowledge that Nissan Computer already has a web site at www.nissan.com,* appropriated the search terms 'nissan' and 'nissan.com' to itself, knowing and intending that such appropriation will have the effect of misdirecting customers looking for Nissan Computer on the Internet to Nissan Motor's web site." (Def.'s Opp'n to Mot. to Dismiss at 10:20–11:1 (emphasis in original).)

For example, the defendant asserts that when a user enters "nissan.com" on the search line at GoTo.com, a popular Internet search engine, the user is given a list of sites that "allegedly correspond to that search term." (Def.'s Supplemental Br. Re: Search Terms at 2:25–27.) At the very top of this results page a line appears, stating: "Quick Hit Result: The Official Site for nissan.com." (*Id.* at 2:27–3:1.) "The 'nissan.com' in this line is a hyperlink *that leads to the Nissan North America* [the plaintiffs'] *web site.*" (*Id.* at 3:1–3 (emphasis in original).) According to the defendant, "a consumer told that the Nissan North America web site is the *official* site for nissan.com would believe that Nissan Computer did not own or operate a web site at that domain name address." (*Id.* at 3:6–8 (emphasis in original).)

Before addressing the merits of this theory of liability, the proposed counterclaims that depend upon it, and the parties' respective arguments in support and in opposition thereto, a brief discussion of the basics of the Internet and Internet search engines is necessary.

## 1. THE INTERNET AND THE ROLE OF INTERNET SEARCH ENGINES[6]

"Using a Web browser ... a cyber 'surfer' may navigate the [Internet]—searching for, communicating with, and retrieving information from various web sites." *Brookfield Communications, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1044 (9th Cir.1999) (citing *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1318–19 (9th Cir.1998) and *United States v. Microsoft,* 147 F.3d 935, 939–40, 950 (D.C.Cir.1998)). "A specific web site is most easily located by using its domain name." *Id.* (citing *Panavision,* 141 F.3d at 1327).

> Upon entering a domain name into the web browser, the corresponding web site will quickly appear on the computer screen. Sometimes, however, a Web surfer will not know the domain name of the site he is looking for, whereupon he has two principal options: trying to guess the domain name or seeking the assistance of an Internet "search engine."

*Id.; see also Sporty's Farm v. Sportsman's Market, Inc.,* 202 F.3d 489, 493 (2d Cir.2000) ("The most common method of locating an unknown domain name is simply to type in the company name or logo with the suffix .com. If this proves unsuccessful, then Internet users turn to a device called a search engine." (footnotes omitted)).

> When a keyword is entered [into a search engine], the search engine processes it through a self-created index of web sites to generate a (sometimes long) list relating to the entered keyword. Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used.

*Id.* at 1045 (citing *Niton Corp. v. Radiation Monitoring Devices, Inc.,* 27 F.Supp.2d 102,

---

**6.** Courts are not strangers to the Internet and e-commerce. Indeed, the wealth of decisional law that has emerged from cases presenting e-commerce and Internet issues has inspired at least one commentator to write a monographic three-volume treatise on the law of the Internet and e-commerce. *See generally* Ian C. Ballon, *E–Commerce & Internet Law* (2001). Courts are not strangers to litigation over the use of Internet

search engines either. *See generally* F. Gregory Lastowka, Note, *Search Engines, HTML, and Trademarks: What's the Meta For?,* 86 Va.L.Rev. 835 (2000) (collecting and discussing search engine cases). Nevertheless, as far as the Court and the parties to this lawsuit have been able to discern, the instant motion presents an issue of first impression, heretofore never reached by any court.

104 (D.Mass.1998); *Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227, 1231–32 (N.D.Ill. 1996); *Shea v. Reno,* 930 F.Supp. 916, 929 (S.D.N.Y.1996), *aff'd,* 521 U.S. 1113, 117 S.Ct. 2501, 138 L.Ed.2d 1006 (1997)); *see also Playboy Enters., Inc. v. Netscape Communications Corp.* (*"Netscape"*), 55 F.Supp.2d 1070, 1072 (C.D.Cal.1999) ("When a person searches for a particular topic in [a] search engine, the search engine compiles a list of sites matching or related to the user's search terms, and then posts the list of sites, known as 'search results.' ").

"Most search engines attempt to rank sites by relevance, but the formula for determining relevance varies by search engine. Relevance is primarily determined by the number of times a given search term appears on a Web page." Lastowka, *supra,* at 849.

> Other factors also figure into the relevance formulas, including the title of the Web page, the number of visitors who come to the Web page, the number of other Web pages that link to the Web page, and whether the search term appears in the address (or URL) of the Web page. Some search engines also include additional factors, such as whether a particular site or group of sites has caught the attention of some member of the search engine company and deserves a higher ranking, or whether the Web site designer paid the search engine company to appear higher in the rankings.

*Id.* (footnotes omitted).[7] For example, "GoTo operates a web site that contains a pay-for-placement search engine. . . ." *GoTo. com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1203 (9th Cir.2000); *see also* Lastowka, *supra,* at 849 n. 73 ("Goto.com promotes the fact that it charges Web sites for higher relevance listings.").

## 2. WHETHER THE DEFENDANT HAS STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED

The plaintiffs argue that their purchase of the search terms at issue in this motion was lawful because the defendant cannot exclude the plaintiffs "from using the terms 'nissan' and 'nissan.com' on the Internet, solely because [the defendant] holds registrations for the Internet domain names 'nissan.com' and 'nissan.net' " since "federal trademark law precludes [the defendant's] assertion of exclusive rights to these terms." (Pls.' Supplemental Br. Re: Search Terms at 2:13–16.) The Court agrees.

Intellectual property rights are the exception to the principle of free competition. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 151, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (noting that one of the purposes of intellectual property law is to determine "not only what is protected, but also what is free for all to use"); *see also* Mark A. Lemley, *Beyond Preemption: The Law & Policy of Intellectual Property Licensing,* 87 Cal.L.Rev. 111, 170 (1999) (stating that "[i]ntellectual property is a deliberate, government-sponsored departure from the principles of free competition, designed to subsidize creators and therefore to induce more creation" (footnote omitted)). As Professor J. Thomas McCarthy explains:

> Generally, the party seeking to establish the existence and validity of a right to exclude another from using a creation or marketing tool has the initial burden to prove its entitlement to one of the forms of intellectual property, such as a trademark. Thus, the burden of proof of validity and infringement is on the party wishing to exclude another from use.

1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition,* § 1:2 at p. 1–5 (2001). Here, the defendant, as the party seeking to exclude the plaintiffs from using the search terms "nissan" and "nissan.com," has not met its burden.

■ It is well-settled that "registration of a domain name for a Web site does not trump long-established principles of trademark law." *Brookfield,* 174 F.3d at 1066; *see also Cardservice Int'l, Inc. v. McGee,* 950 F.Supp. 737, 740 (E.D.Va.1997) (rejecting claim that junior user acquired special rights

---

**7.** "URL" stands for "Uniform Resource Locator", an Internet address which identifies each web page's physical location in the Internet's infrastructure. *See In re DoubleClick Inc. Privacy Litig.,* 154 F.Supp.2d 497, 501 (S.D.N.Y.2001).

by first registering and using Internet domain name). Because this Court has already found that "the plaintiffs have a valid, protectable trademark interest in the 'Nissan' mark," *Nissan*, 89 F.Supp.2d at 1162, the defendant's registration of the Internet domain names "nissan.com" and "nissan.net" cannot trump the plaintiffs' use of the "Nissan" mark on the Internet or anywhere else.

This is not to suggest that Internet search terms are entirely "up-for-grabs." There are protections against the registration of a domain name for the improper purpose of extorting large sums from senior users for its transfer, also known as "cybersquatting" or "cyberpiracy". *See, e.g., Sporty's Farm*, 202 F.3d at 493 (defining "cybersquatting" as "the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners ..., who not infrequently have been willing to pay 'ransom' in order to get 'their names' back." (citing H.R.Rep. No. 106–412, at 5–7; S.Rep. No. 106–140, at 4–7 (1999))); *Chatam Int'l, Inc. v. Bodum, Inc.*, 157 F.Supp.2d 549, 553 n. 7 (E.D.Pa.2001) (defining "cyberpiracy" as "as the registration of a domain name of another's mark for the primary purpose of selling the domain to the mark owner for an extortionate sum of money."). There are also protections against the registration of a domain name that infringes another's trademark, *see, e.g., Brookfield*, 174 F.3d at 1053–61 (affirming injunction prohibiting the defendant from using the plaintiff's trademark as an Internet domain name), and against the registration of a domain name for the improper purpose of diluting another's mark, *see, e.g., Panavision*, 141 F.3d at 1326–27 (affirming district court's grant of the plaintiff's motion for summary judgment where the defendant diluted the plaintiff's marks by using the marks in the defendant's domain names).[8]

Under both infringement and dilution theories, many courts have also applied protections against and limitations on the use of a trademark in a web page's metatags—embedded codes that help search engines identify the content of a website [9]—for the improper purpose of manipulating a search engine's results list. *See, e.g., Brookfield*, 174 F.3d at 1066–67 (affirming injunction prohibiting the defendant's use of the plaintiff's mark in the defendant's web pages' metatags); *Nettis Envtl. v. IWI Inc.*, 46 F.Supp.2d 722, 724 (N.D.Ohio 1999) (noting that the defendant was ordered to "purge its webpage of all materials which could cause a web search engine looking for [the plaintiff], or similar phrases to pull up [the defendant's] webpage."); *Niton Corp. v. Radiation Monitoring Devices, Inc.*, 27 F.Supp.2d 102, 105 (D.Mass.1998) (enjoining the defendant from using metatags to attract users to its website in a way that confused the parties and their products); *see also* Lastowka, *supra*, at 875 n. 196 (collecting cases in which courts have found liability for improper business competitor use of metatags). There appears to be no good cause for not extending these protections and limitations to cases where one infringes or dilutes another's mark by purchasing a search term—as opposed to using another's mark in one's metatags—for the purpose of manipulating a search engine's results list. This is not such a case, however, because the plaintiffs cannot infringe upon or dilute their own mark—much less, one in which they have a valid, protectable interest.

This analysis applies equally to both the search term "nissan" and "nissan.com" because any permutations one may derive from adding a top-level domain ("TLD"), which merely describes the nature of the enterprise registering the domain name—i.e., ".com" (commercial), ".org" (non-profit and miscella-

---

8. Dilution generally occurs through the blurring of a famous mark—using a plaintiff's famous mark "to identify the defendant's goods or services, creating the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product"—or tarnishment of the mark—"improperly associat[ing]" a plaintiff's famous mark "with an inferior or offensive product or service"—but is not limited to just these two categories. *Panavision*, 141 F.3d at 1326, n. 7; *see also Netscape*, 55 F.Supp.2d at 1075.

9. For a thorough discussion of the technology and function of metatags, *see Playboy Enterprises, Inc. v. Terri Welles, Inc.*, 78 F.Supp.2d 1066, 1091–92 (S.D.Cal.1999) and Lastowka, *supra*, at 844–46.

neous organizations), or ".net" (networking provider) [10]—to the second-level domain "nissan" are indistinguishable as a matter of law. *See Brookfield,* 174 F.3d at 1055 (noting that the addition of ".com" is "inconsequential in light of the fact that . . . the '.com' top-level domain signifies the site's commercial nature"); *see also Image Online,* 120 F.Supp.2d at 878 ("In fact, rather than look *at* a[ ]TLD to determine trademark rights, the Ninth Circuit and others ignore the TLD as though it were invisible next to the second level domain name in an infringement action. The Ninth Circuit and other courts' analyses of trademark infringement in the context of domain names further reinforce this Court's finding that a TLD is not subject to trademark protection." (emphasis in original)).[11]

After the Court indicated at oral argument its intention to adopt the foregoing analysis, the defendant conceded that it cannot preclude the plaintiffs from acquiring the "nissan" search term *per se,* but contended that it has a right to protect its interest in "nissan.com" as an address.[12] Similarly, the defendant argues in its supplemental brief that its proposed state-law counterclaims are not based on a property interest it has in the search terms, but rather its property interest in the domain names "www.nissan.com" and "www.nissan.net." (Def.'s Supplemental Br. Re: Search Terms at 3:20–23.) According to the defendant, "[l]ike any other business,

[the defendant] has a right to prevent others from attempting to divert or confuse its customers." (*Id.* at 3:23–4:1.) In other words, the defendant appears to argue that it is not the plaintiffs' purchase of the search terms that creates liability, but the effect of their purchase and use of the search terms that create liability. In some instances, this argument would be compelling, but not here.

By way of analogy, the purchase of advertising in a periodical is not *per se* unlawful. When that advertising is false or misleading, however, the effect of the purchase or use of the advertising becomes unlawful. Similarly, if the plaintiffs had purchased the search term "Microsoft.com," resulting in the display of a results page which stated: "Quick Hit Result: The Official Site for Microsoft.com," and users who clicked on the hyperlink were diverted to the plaintiffs' web site, the plaintiffs' conduct would be unlawful. Again, this is not the case here. The plaintiffs have merely purchased search terms, in one of which ("nissan") they indisputably have a valid, protectable trademark interest and in the other ("nissan.com"), by operation of the law that treats a ".com" domain name as indistinguishable from its second-level domain root, an equally valid, protectable trademark interest.

In an attempt to overcome this analysis, the defendant has provided an analogy of its own. According to the defendant,

**10.** For a thorough discussion of TLDs, and their origins and purposes, *see generally Image Online Design, Inc. v. Core Ass'n,* 120 F.Supp.2d 870 (C.D.Cal.2000).

**11.** In an attempt to salvage its unfair competition claim under a passing off theory, the defendant argues that "[e]ven if the '.com' portion of the Nissan Computer web site is deemed to be a generic term, such that Nissan Computer can assert no separate trademark rights in 'nissan.com,' courts have repeatedly recognized that a competitor *may not* use a generic term to pass itself off as a competing organization or its product." (Def.'s Supplemental Br. Re: Search Terms at 5:22–25.) The defendant is misguided. As then—D.C. Circuit Judge Ruth Bader Ginsburg stated in *Blinded Veterans Association v. Blinded American Veterans Foundation,* 872 F.2d 1035 (D.C.Cir.1989), "if an organization's own name is generic, a competitor's subsequent use of that name may give rise to an unfair competition [passing off] claim if the competitor's failure adequately to identify itself as distinct from the

first organization causes confusion or a likelihood of confusion." *Id.* at 1043. Here, neither the plaintiffs' nor the defendant's business name is generic. Moreover, the addition of the ".com" TLD to the term "Nissan" does not render the resulting "nissan.com" a generic composite term.

**12.** The defendant's counsel argued,

> As far as Nissan Motor's right to be able to purchase Nissan per se on the Internet as a search term, I don't have a problem with respect to the fact that everybody would have the right to go out and buy Nissan per se, but when you are talking about nissan.com, we are not talking in the trademark context here. We are talking about something that is very literal with zeros and ones, and when you are talking about going out and purchasing that, that is something which really starts to mislead people, because we are the ones that have the nissan.com address.

(Reporters Tr., July 23, 2001, at 20:20–21:4.)

[the plaintiffs'] conduct is the equivalent, in the Internet context, of paying the occupant of the information booth at the airport to direct people to the United Airlines counter whenever anyone should inquire where the Starbuck's coffee counter is located. Although there is, presumably, no likelihood that persons who arrive at the United Airlines desk will be confused about whether it is actually Starbuck's, the misinformation will either convince frustrated customers to stop searching for Starbuck's, or lead them to believe that the Starbuck's no longer operates at the airport and that United has taken over the former Starbuck's counter.

(*Id.* at 5:1–7.) The analogy, however, is inapposite. In the defendant's analogy, the consumer does not know the location of the business (Starbuck's) it seeks. Here, however, the consumer who is allegedly misdirected by the plaintiffs' purchase of the search term "nissan.com" has the location of the business (nissan.com) it seeks in hand.

"Although the use of computers may once have been the exclusive domain of an elite intelligentsia, even modern-day Luddites are now capable of navigating cyberspace." *GoTo.com*, 202 F.3d at 1209. Typing "nissan.com" into a search engine to obtain the domain name for "nissan.com" is as pointless, as the plaintiffs correctly point out, "as telephoning a business and asking for its telephone number." (Pls.' Supplemental Br. Re: Search Terms at 7:28–8:1.) Accordingly, because the theory underlying the defendant's proposed counterclaims "defies common understanding of the Internet," *Image Online*, 120 F.Supp.2d at 877, the defendant has not stated claims upon which relief can be granted. Stated differently, the defendant owns the registration of a domain name. That ownership bestows upon the defendant *only* the right to have Internet users go to the defendant's web site when a user types the domain name into a web browser. Absent a basis for claiming broader intellectual property rights in a domain name, a domain name is an address, nothing more.

## III. CONCLUSION

Because the defendant has failed to allege any wrongful or deceptive conduct on the part of the plaintiffs—much less, a tenable theory for any form of liability—the Court need not apply the facts alleged in the proposed SAA to each of the six proposed state-law counterclaims. Consequently, the Court need not reach the choice of law issue briefed by the parties either. No later than 14 days from the issuance of this Order, the defendant shall serve on all parties and file its second amended answer and counterclaims consistent with this Order and the Court's August 1, 2001 Order.[13]

IT IS SO ORDERED.

---

13. The defendant has also requested that the Court allow it to file additional or supplemental expert reports concerning factual issues raised by the three federal law counterclaims approved of in the Court's August 1, 2001 Order. (Def.'s Mot. at 4:16–20; Def.'s Supplemental Br. Re: Choice of Law at 2 n. 1.) That request is granted. If it has not already done so, the defendant shall serve its expert reports, no later than 14 days from the issuance of this Order.